```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
      - - - - - - - - - - - - - - - x
3     THE UNITED STATES OF AMERICA,
                                         Criminal Action No.
4                    Plaintiff,         1:21-cr-00628-ABJ-1
                                         Monday, December 19, 2022
5     vs.                                2:04 p.m.

6     MICHAEL ANGELO RILEY,

7                    Defendant.
      - - - - - - - - - - - - - - - x
8     _____

9                    TRANSCRIPT OF ORAL RULING
            HELD BEFORE THE HONORABLE AMY BERMAN JACKSON
10                    UNITED STATES DISTRICT JUDGE

11    _____

12    APPEARANCES:

13    For the United States:    CHRISTOPHER R. HOWLAND, ESQ.
                                U.S. ATTORNEY'S OFFICE FOR D.C.
14                              601 D Street NW, Room 5-1529
                                Washington DC, DC 20530
15                              (202) 252-7106
                                christopher.howland@usdoj.gov
16

17    For the Defendant:        CHRISTOPHER MACCHIAROLI, ESQ.
                                SILVERMAN, THOMPSON, SLUTKIN & WHITE
18                              1750 K Street, NW, Suite 810
                                Washington, DC 20006
19                              (202) 539-2444
                                cmacchiaroli@silvermanthompson.com
20

21    Court Reporter:                   Lisa A. Moreira, RDR, CRR
                                        Official Court Reporter
22                                      U.S. Courthouse, Room 6718
                                        333 Constitution Avenue, NW
                                        Washington, DC  20001
23                                      (202) 354-3187

24

25
```

```
 1                    P R O C E E D I N G S
 2           THE COURTROOM DEPUTY:  Good afternoon, Your Honor.
 3   This afternoon we have Criminal Case No. 21-628, The United
 4   States of America v. Michael Angelo Riley.
 5           Will counsel for the government speak into his
 6   microphone and identify himself for the record and then
 7   counsel for the defendants.
 8           MR. HOWLAND:  Thank you.  Good morning or good
 9   afternoon, Your Honor; Christopher Howland on behalf of the
10   United States.  I'm taking over this case; so I recognize
11   that I'm a new face, but it's nice to meet you.
12           THE COURT:  You're taking it over now?
13           MR. HOWLAND:  I'm taking over going forward, yes,
14   Your Honor.
15           THE COURT:  Okay.  All right.
16           MR. MACCHIAROLI:  Good afternoon, Your Honor;
17   Christopher Macchiaroli and Emma Mulford on behalf of
18   Mr. Riley, who is present between us.
19           THE COURT:  All right.  Good afternoon, everybody.
20           The defendant made an oral motion for judgment of
21   acquittal at the close of the government's case.  The Court
22   reserved ruling pursuant to Rule 29B.
23           The verdict was a hung jury on Count 1; guilty
24   verdict on Count 2.
25           The defendant has now filed a brief in support of
```

1   his Rule 29 motion at Docket 82.  The government responded

2   at 85, and there was a reply at Docket 86.

3           So the standard to be applied is as follows:

4           In *United States vs. Treadwell*, 760 F. 2d 327 at

5   Page 333, the D.C. Circuit said, quoting *United States vs.*

6   *Davis* at 562 F. 2d 681 at 683, "In ruling on a motion for a

7   judgment of acquittal, 'the trial court must view the

8   evidence in the light most favorable to the Government

9   giving full play to the right of the jury to determine

10  credibility, weigh the evidence and draw justifiable

11  inferences of fact."

12          The *Davis* court said, "It is only when there is no

13  evidence upon which a reasonable mind might fairly conclude

14  guilt beyond a reasonable doubt that the judge may properly

15  take the case from the jury."

16          Put another way, as the Circuit said in *United*

17  *States vs. Weisz*, 718 F. 2d at 437, citing *United States vs.*

18  *Singleton* at 702 F. 2d 1159, "a district court may grant a

19  motion for judgment of acquittal only when, quote, a

20  reasonable juror must necessarily have had a reasonable

21  doubt as to the defendant's guilt."

22          In evaluating a motion for judgment of acquittal,

23  the Court should consider the evidence in the light most

24  favorable to the government.  That's *United States vs. Wahl*,

25  290 F. 3d 370 at 375, D.C. Circuit 2002.

1        The defendant tips his hat to these authorities,

2   but then he uses language suggesting that the standard is

3   something else entirely.  In his motion, Docket 82 at Page

4   17, he says, "This Court must grant Officer Riley's motion

5   for judgment of acquittal if it finds that the evidence is

6   such that a reasonable trier of fact would have a reasonable

7   doubt."

8        But that is an inaccurate and misleading

9   formulation.  The law is, according to *United States vs.*

10  *Foster*, 783 F. 2d 1087 at 1088 from the D.C. Circuit:  The

11  Court must grant a motion for judgment of acquittal when the

12  evidence is such that a reasonable juror must have a

13  reasonable doubt or, as the Court of Appeals put it in *Wahl*,

14  290 F. 3d at 375, the Court should deny a motion for

15  judgment of acquittal if it finds, quote, any rational trier

16  of fact could have found the essential elements of the crime

17  beyond a reasonable doubt.  It is not sufficient to be able

18  to posit some scenario in which a juror could have had a

19  reasonable doubt.

20       The grounds here for the motion for judgment of

21  acquittal are difficult to discern in the tsunami of

22  condescension and italicized derision that I've been begging

23  the parties to forgo since this case began and the

24  unnecessary footnotes attacking the investigative techniques

25  and what the government might have thought at one point the

1    case might be and what the prosecutors did or did not say.

2    But the grounds appear to be, once you get through all that,

3    as follows:  Insufficiency of the evidence on the purpose or

4    scope of the grand jury.

5          The fact that many others had viewed the Facebook

6    post before the defendant told Mr. Hiles to take it down or

7    take down part of it; the FBI had even received it as of the

8    time of the defendant's message or at least after the

9    defendant's message on January 8th and potentially before;

10   and then the defense lists a series of facts on Page 12 of

11   the motion that, according to the defense, are facts upon

12   which no reasonable juror could have found Officer Riley

13   guilty beyond a reasonable doubt.  I don't need to read the

14   entire list because they're all there on Page 12 of the

15   motion.

16         But those are, at best, facts that could have

17   given a reasonable juror a basis to doubt, and they are

18   primarily references to things Officer Riley did not say or

19   did not do, which plainly, if he had done, would have made

20   the case stronger but none of which were necessary to

21   establish guilt beyond a reasonable doubt.

22         And here, based on both my attendance at the trial

23   and the consideration of the evidence then, with the benefit

24   of the ability of being able to view the demeanor of the

25   witnesses at that time, and also based on a detailed

1    reconsideration of all the evidence guided by the

2    submissions of the parties, I find that the motion should be

3    denied.

4         I find, viewing the evidence in the light most

5    favorable to the government and drawing reasonable

6    inferences from the evidence in favor of the government,

7    that a rational trier of fact could have found the essential

8    elements of the crime beyond a reasonable doubt.  I cannot

9    and do not find that, quote, There is no evidence upon which

10   a reasonable mind might fairly conclude guilt beyond a

11   reasonable doubt, close quote.

12        Nor can I find that, quote, a reasonable juror

13   must necessarily have had a reasonable doubt as to the

14   defendant's guilt, close quote.

15        So what crimes are we talking about?

16        Count 1 alleged that on January 7, 2021, the

17   defendant knowingly corruptly persuaded, or attempted to

18   persuade, another person to alter, destroy, mutilate, or

19   conceal an object with the intent to impair the object's

20   integrity and availability for use in an official

21   proceeding.  That is, on that date, Defendant Riley directed

22   Jacob Hiles to take down the portion of a Facebook post

23   concerning his presence inside the U.S. Capitol on January

24   6, 2021, with the intent of making that record unavailable

25   for use in a federal grand jury proceeding resulting from

1   the January 6th breach of the U.S. Capitol.

2          The elements of that offense are, first, that the

3   defendant knowingly corruptly persuaded another person or

4   attempted to do so;

5          Second, that the defendant acted with intent to

6   cause or induce the other person to alter, destroy,

7   mutilate, or conceal an object with the intent to impair the

8   object's integrity or availability for use in an official

9   proceeding;

10          Third, that the defendant knew or should have

11   known that the official proceeding was pending or was likely

12   to be instituted and acted with awareness that the natural

13   and probable effect of his conduct would be to obstruct or

14   impede that proceeding;

15          And fourth, that the official proceeding was, in

16   fact, a federal proceeding.

17          The official proceeding that was alleged to be the

18   object of Count 1 was a federal grand jury proceeding

19   resulting from the January 6th breach of the United States

20   Capitol, not an FBI investigation.  But the government did

21   not have to prove that the defendant knew that the grand

22   jury proceeding was a federal as opposed to a local

23   proceeding.

24          Count 2 alleged that on January 20, 2021, the

25   defendant himself corruptly altered, destroyed, mutilated,

1    or concealed a record, document, or other object or

2    attempted to do so with the intent to impair its integrity

3    or availability for use in an official proceeding.  That is,

4    that on that day Defendant Riley deleted his Facebook direct

5    communications with Jacob Hiles to impair their use in the

6    federal grand jury proceeding resulting from the January 6th

7    breach in the U.S. Capitol.

8              The elements of Count 2 are, first, that the

9    defendant altered or destroyed or mutilated or concealed any

10   record;

11             Second, the defendant acted with the intent to

12   impair the records, integrity, or availability in an

13   official proceeding;

14             Third, that the defendant knew or should have

15   known that the official proceeding was pending or likely to

16   be instituted and acted with awareness that the natural and

17   probable effect of his conduct would be to obstruct or

18   impede that proceeding;

19             Fourth, that the defendant acted corruptly;

20             Fifth, that the official proceeding was a federal

21   proceeding.

22             The statute requires that the obstructive conduct

23   be connected to a specific official proceeding.  The

24   official proceeding that is alleged to be the object of

25   Count 2 is a federal grand jury proceeding resulting from

1    the January 6th breach of the U.S. Capitol.

2              With respect to both counts, the law does not

3    require proof that the official proceeding was actually

4    pending, or underway, or that it was about to be instituted

5    at the time of the defendant's actions.  But if the official

6    proceeding was not pending at the time of the defendant's

7    conduct, the government must prove beyond a reasonable doubt

8    that the official proceeding was reasonably foreseeable to

9    the defendant at that time.

10             In addition, the law requires that there be a

11   connection or relationship in time, causation, or logic

12   between the obstructive act and the proceeding.  That is,

13   the government must show that the defendant had knowledge

14   that his actions were likely to affect the proceeding.  As I

15   said earlier, the official proceeding must be a grand jury

16   proceeding, not simply an FBI investigation.  But the

17   government is not required to show that the defendant's sole

18   intent was to impair the object's availability for a

19   foreseeable grand jury proceeding.

20             That is the legal landscape.

21             What is the evidence from which a reasonable juror

22   could conclude that the defendant was guilty of Count 1 or

23   Count 2?  It is primarily the defendant's own statements to

24   Mr. Hiles and to others.

25             I will put them all in the record in detail in

1     a moment, but in sum, as to Count 1, the defendant tells

2     Mr. Hiles to take down a very specific portion of what he

3     posted on Facebook.  The evidence was sufficient to support

4     a reasonable inference on the part of the jury that he

5     knowingly corruptly sought to make information unavailable

6     to a grand jury in federal court investigating what one

7     could conclude that he anticipated could be a felony:

8     Mr. Hiles's entrance into the Capitol building on January

9     6th.

10          His statements on and around January 7th all bear

11    on his state of mind at the time, and they all include his

12    understanding as a U.S. Capitol police officer what the

13    January 6th charges would be as well as his efforts to

14    minimize and characterize his interactions with Hiles when

15    talking to others.

16          The fact that the post he viewed may have

17    indicated the number of previous views does not negate the

18    sufficiency of the evidence that was presented.

19          The defense argued that it could give rise to a

20    reasonable doubt as to the defendant's intent, but the jury

21    was not required to accept that proposition.  Indeed, it

22    could have reasonably concluded that those notes at the

23    bottom of the post, if he noticed them at all, did not play

24    a role in his state of mind since he went to the trouble to

25    direct Hiles to take down that portion of the post anyway

1    and reiterated the significance of being inside the building

2    in multiple subsequent exchanges.

3              The fact that what happened inside was captured on

4    camera is also a complete red herring.  Prosecutors could

5    not tell from the cameras alone who the offenders were.

6    Unlike a situation in the sort of sit-in the defense

7    described when it put on its case, the rioters had already

8    left, and the social media posts were critical evidence in

9    connecting the anonymous members of the mob inside with

10   their identities.

11             Also, I do not find the fact that others

12   identified Mr. Hiles to the FBI at the same time he was

13   urging Mr. Hiles to make the information unavailable bears

14   on Mr. Riley's intent or the elements of the offense.

15             As to Count 2, the defendant deleted all of his

16   communications with Hiles and what he thinks are the records

17   of his phone communications with Hiles.  It does not matter

18   if that effort was incomplete or unsuccessful.  The record

19   itself reveals its own lack of sophistication about how it

20   all worked.

21             The evidence was sufficient to support a

22   reasonable inference on the part of the jury that he

23   knowingly corruptly sought to make information unavailable

24   to a grand jury in federal court which he could reasonably

25   foresee, based on the fact that he did this not when he

1  learned Hiles had been misrepresenting what he did on

2  January 6th, not after he learned that Hiles had been

3  charged, not after he learned about an OPR complaint against

4  him, but immediately after he learned that Hiles had told

5  the FBI about their communications; and, therefore, he could

6  reasonably foresee that it would be investigating -- that a

7  grand jury would be investigating an obstruction of justice

8  that he had committed.

9  The fact that the deletion of the material was

10  accompanied by a completely false cover story as to why he

11  did it further supports that inference.

12  So this is going to be laborious, but the question

13  is was the evidence sufficient, and what is the evidence

14  from which inferences can be drawn?  And so I have to go

15  through the evidence, and the evidence is the communications

16  themselves.

17  On January 7, 2021, at 12:45 a.m., Mr. Hiles posts

18  his post describing in great detail what happened at the

19  Capitol building and suggesting that essentially he'd been

20  pushed inside, pushed up the steps, et cetera.  And that was

21  at 12:45 a.m., and there's no indication that the defendant

22  saw Mr. Hiles's post at that time.

23  January 7th at 11:53 a.m., Mr. Riley is now

24  online, and he posts on his Facebook page:  Every protester

25  that assaulted an officer yesterday, committed property

1    damage, and broke into the Capitol building should be

2    charged federally in district court.  If we don't send a

3    message, it will surely happen again.

4            It's true at that time he said "broke into the

5    Capitol building."  That's about the only time he said it

6    that way.  And it's interesting that while he said that word

7    he is already talking about being charged federally in

8    federal district court.  This is first thing in the morning

9    essentially on the next day, and there's no indication that

10   he's already seen Hiles's post.

11           And he knows that there is only one way that

12   people can be charged in federal court after the fact, and

13   that's grand jury, if you're talking about felonies.  And we

14   will find out later that that is exactly what he was talking

15   about.

16           At 1:15 p.m., after he posts that, on January 7th

17   he gets a communication -- a Facebook message from Mary

18   Inman who lets him know that there was a -- that she posted

19   a comment on someone else's video, and so she directs his

20   attention at that point, 1:15, to Jacob Hiles's video --

21   Jacob Hiles's Facebook post.

22           So what happens at 1:35 p.m. on January 7th?

23   Mr. Riley posts the following Facebook message:

24           Hey Jake, I'm a Capitol police officer who agrees

25   with your political stance.  Take down the part about being

1   in the building.  They are currently investigating, and

2   everyone who was in the building is going to be charged.

3   Just looking out.

4           So he knows that being investigated and being

5   charged is different.  There's no indication that he saw,

6   when he looked at the post, the number of previous views

7   that the defense made a point of showing the jury because he

8   clearly did not say:  I wish you hadn't said this.  Sorry so

9   many people have read that.

10          What he says is:  Take it down.  Take a tip from

11  me.  Take it down.

12          And then Mr. Hiles, though, doesn't take his

13  advice.  He kind of remonstrates about the fact that he

14  didn't do anything wrong.

15          January 7th, 1:57 p.m.:  Thank you.  I was told to

16  go into the building, he says.

17          And he goes on at some length about the details.

18  "Investigate me however you'd like.  Thank you for the heads

19  up."  And he also attaches videos to the material that he

20  sends to Officer Riley.  We don't know whether he watched

21  them or not.

22          And then Mr. Hiles reiterates:  Watch these

23  videos.  Does it look like I'm being a terrorist to you?

24          He's still defending himself.

25          And in response, the defendant tries to let him

1    know, no, actually I meant what I told you.  1/7/2021, 2:04

2    p.m., he says:  I get it.  It was a total shit show.  I just

3    wanted to give you a heads up.

4            And so he's suggesting again, listen to the advice

5    I'm giving you, and then they talk about getting together

6    fishing, et cetera.

7            And there are more conversations that go on

8    throughout the afternoon, texts -- Facebook messages back

9    and forth.

10           2:05 p.m., several from Riley to Hiles and back

11   and forth about getting together in D.C. or Kent Island;

12   more about what Mr. Riley was aware of, bad things that had

13   happened that day.

14           Mr. Hiles says at 2:06 p.m.:  I saw a couple of

15   fights between police and some crazy people, but a lot of

16   the injuries yesterday looked like they were self-inflicted

17   by police gassing and pepper-spraying other police who

18   didn't have masks or guns.  And they're talking about the

19   woman who was shot.

20           But then Mr. Riley again, now at 2:09 p.m. on

21   January 7th, emphasizes the importance of being inside as

22   opposed to outside.  He says:  I'm not at liberty to say the

23   actual specifics of her shooting, but she'd just broken a

24   window and was attempting to gain entry through that window

25   into an area where people were barricaded with law

1    enforcement.  Remember, when the building was breached there

2    was a joint session going on.  No. 2 through 5 in our

3    government was in the building at the time.  Also several

4    rooms in that building are critical to national security.

5    Truly, it's absolutely amazing that more people weren't

6    shot.

7          So he understands the difference between being

8    outside and being inside.

9          Hiles, meanwhile, remonstrates again at 2:10 p.m.:

10   I don't think I did anything wrong at all yesterday.  And

11   they go back and forth a bit.  Hiles is sending some videos.

12         And Mr. Riley talks about the officers who were

13   seriously injured and his concerns about that.  "A buddy of

14   mine is in the hospital."

15         And then he repeats at 2:14 p.m.:  The only thing

16   I can see is if you went in the building and they have proof

17   you will be charged.  You can always articulate that you had

18   nowhere to go, but that's for court.

19         And Mr. Hiles is still, 2:14 p.m., giving his

20   versions of the events.  "I just wanted to leave.  The

21   officers assisted me.  I don't know what I can say about

22   it."  He goes on and on telling his own version.

23         And Mr. Riley says at 2:28 p.m. on January 7th:

24   Don't sweat it.  They might choose to only charge certain

25   people and not everyone.  Personally I don't know what they

1    have decided.  Just know our guys and the FBI are going

2    through everything.

3              So after an hour back and forth between the two,

4    after Hiles continues to justify his behavior, Mr. Riley is

5    still warning him, still giving him that heads up.  And this

6    goes on.

7              They talk about the dangers to the officers, and

8    then at 2:34 Mr. Riley says to Mr. Hiles again, he wants to

9    emphasize why he's helping.

10             "I have a lot of buddies who know you, and that's

11   why I reached out.  Yesterday was a sickening day.  There's

12   so much other shit I can tell you here or show you pictures

13   of, but let's just say there were straight-up acts of

14   terrorism yesterday.  The MAGA rally a few weeks ago was a

15   beautiful sight.  This was something completely different."

16             And he tells Mr. Hiles:  Hug your daughter.  Don't

17   sweat the small stuff.  Enjoy life to the fullest.

18             He's definitely trying to establish a friendship

19   with this person who he respects as a fishermen, but he's

20   also continuing to emphasize that being inside the building

21   is different than being outside the building.

22             They go on, 2:40, 2:42, all the way through the

23   evening chitchatting about their beliefs.  Mr. Riley is

24   expressing serious concerns about the officers who were

25   seriously hurt and how much that means to him.  And then

1    Mr. Hiles is still trying to pretend that half of this stuff

2    didn't happen at 6:58 p.m.

3           On January 7th he says to Mr. Riley:  I swear I

4    think it was all a set-up yesterday.

5           And Mr. Riley's response is essentially to

6    commiserate with Mr. Hiles because he wants to make this

7    connection with him.  "Everything's a set-up.  No doubt they

8    wanted this.  Suddenly no one cares about the obvious

9    election fraud.  Why didn't they do an audit?  They only had

10   to do it in two fucking counties.  We need to talk some

11   time."  That's Riley to Hiles.

12          Then Hiles is still saying -- now he's in -- by

13   7:00 p.m. into a full-on false flag theory about the police

14   let us in.  "It was all for optics.  You know, it's all a

15   fake."  That's at 7:00 p.m.  He's sending Riley copies of

16   messages he sent to other people.

17          Riley at that point is not so much agreeing with

18   that.

19          7:06 p.m.:  Yes, I'm not going with all that.  We

20   can't just shoot people for coming in the building.  There

21   were mistakes made, but in today's world our hands are tied.

22   And they go on at that point to exchange essentially

23   political views, which they're certainly entitled to do.

24          And at 9:53 p.m. Mr. Riley says:  99 percent of

25   the people were peaceful.  You were one of them.

1          Mr. Hiles goes back and says:  So what was gained?

2    What was accomplished?  It was all so dumb and senseless.  I

3    was there because I don't agree with elections being stolen.

4    I'm sorry that any of this happened.  I thought yesterday

5    would be a great moment for our country, but I left feeling

6    like I watched our country die.

7          And Mr. Riley still wants to connect with him.

8    He's upset about the injuries to the officers, but he says:

9    It was a sad day.  I think there's so many devious forces at

10   play right now.  Like I said, we should talk sometime.

11         They continue to exchange some messages on January

12   7th about where they can get together and fish, and then we

13   get to January 8th.

14         And yes, from about 7:00 a.m. to 7:33 a.m. they're

15   talking about fishing, but then Mr. Hiles says at 7:33 a.m.

16   on January 8th:  Hopefully there's still a future in this

17   country to settle down to.  It's getting scarier by the day.

18         Mr. Riley at 7:46 p.m.:  It absolutely is.

19         There's a lot of discussion where they're kind of

20   blending politics with fishing.

21         There is some argument, I think, made during the

22   trial that all they talked about was fishing, but that's not

23   quite correct.

24         Mr. Riley says at 8:08 a.m. on January 8th:  It

25   started under Obama, the complete disrespect for this

1    profession and law enforcement.  It's only gotten worse.

2          He goes on and on about the police can't really do

3    their jobs anymore, and then he joins and says at 8:09 a.m.

4    to Mr. Riley:  I'm starting to think some of the agitators

5    were Antifa.  They used the exact same tactics in Portland,

6    bear spray, metal pipes, explosives.  And then he says:

7    Some good news.  One of those douche bags lit a quarter

8    stick of dynamite and tried to throw it at us, and it blew

9    up in his hand.

10          8:15 a.m. he says to Mr. Hiles:  The politicians

11    take no responsibility for their rhetoric.  It's their

12    rhetoric that incites.  It's their rhetoric that demonizes

13    law enforcement.  They suck.  I can tell you stories after

14    being on Capitol Hill for 26 years.

15          So he's, you know, bonding with this guy over

16    these points of view, not just the fishing.  He's

17    commiserating with him.

18          He says at 8:25 a.m. on January 8th:  I just

19    talked with my chief.  You have to understand our

20    preparedness for these demonstrations is based on

21    intelligence.  You have to understand the politicians don't

22    want officers in riot gear at the Capitol.  It's all about

23    optics.

24          And he's talking about why it was that the use of

25    force wasn't harder going back on the part of the officers.

1          And he explains at 8:26 a.m. to Mr. Hiles:  They

2     were trying to get them to leave.  The permit was for the

3     West Front.  Once they got up on the Lower West Terrace they

4     violated the law.

5          And Mr. Hiles is just asking questions about the

6     pepper spray and his lungs have been bothering him.

7          And Mr. Riley says at 10:04 a.m. on January 8th:

8     Yeah, bro, not sure when you're breathing it in like that

9     for sustained periods.  I would definitely go get it checked

10    out.  The Antifa guys were spraying bear spray.  That shit

11    isn't being designed to be sprayed on humans, and everyone

12    was breathing it in.  Can't hurt to get your lungs checked.

13         So they're kind of chums at that point.

14         And they continued to discuss the fact that it was

15    all these left-wing Antifa people that were actually doing

16    all the harm and spraying the spray on January 8th, and that

17    goes on for a while.

18         Riley says at 12:28 p.m. on January 8th:  It will

19    really be interesting if people start to get arrested to see

20    who they are and what their affiliations are.

21         And Hiles says to Riley:  How did a crowd of

22    Antifa get into the Capitol with the press?  I was led into

23    the building through an open unguarded door with hundreds of

24    others.  When I entered the building there was vandalism

25    present but no one vandalizing anything, and all the things

1   that were vandalized were vandalized for photographic

2   affect.  The priceless artifacts were untouched.  I swear, I

3   think Antifa was allowed to get photos dressed as Trump

4   supporters then the actual Trump supporters were allowed in

5   to make it look like the damage was caused by Trump

6   supporters, I swear.

7          But Mr. Riley didn't buy that.  By 12:33:  I swear

8   it appears that way, but there was no major conspiracy to

9   make it look staged.

10         And he starts sharing some information and

11  explaining at 12:35 on January 8th:  People were allowed in

12  at that point to fortify areas within the building that were

13  essential to national security while we waited for

14  reinforcements.  The perimeter was collapsed to harden vital

15  areas.

16         So he's explaining all of that.

17         He says at 12:50 on January 8th:  Yes, we

18  surrendered the building, but we did it to save lives and

19  fortify the areas and people of importance.

20         So they're still talking on January 8th, 12:58

21  p.m.  He's still reassuring Mr. Hiles.

22         Mr. Riley says:  There is a science behind

23  inciting incidents like this.  Humans get caught up in the

24  mayhem.  You did nothing wrong like 99 percent of the people

25  there.

1              And while he is chitchatting with Mr. Riley on

2     January 8th, he then gets a message at 2:05 p.m. from

3     another officer in the U.S. Capitol Police, Lagambi --

4     actually, I'm sorry, that's 2:05 a.m. on January 9th he gets

5     a text from Lagambi who says:  I'm going to turn that

6     motherfucker Jake Hiles in.  I already called Intel.

7              Riley responds:  LOL, I guess you don't like him.

8     What did he say?

9              And Lagambi tells him, even though he already

10    knew:  He was one of the guys that stormed the Capitol, and

11    I couldn't stand what he was saying about us.  He had videos

12    and shit of him inside the building.

13             So now, if the defendant didn't know before

14    because he didn't watch the videos, he now knows that

15    Mr. Hiles was inside, and Lagambi emphasizes again, like

16    inside the Capitol.

17             And Mr. Riley responds to him at 2:30 in the

18    morning on January 9th:  All those morons posting shit are

19    going to be charged.  Which is not exactly a direct

20    response.

21             And Lagambi tells him again:  Yeah, I haven't

22    officially done it.  I just talked to my buddy Andriko in

23    Intel.  I was just pissed about his false statements and

24    shit.

25             So at this point he knows Hiles is saying things

1    that aren't true, but he does not ditch him as a friend at

2    that point.

3           Meanwhile, the next thing that happens on January

4    9th at 11:51 a.m., Mr. Shepherd sends Mr. Riley information

5    about Jacob Hiles, and it's the video of him smoking pot

6    inside the Capitol.  So now he knows he not only got inside,

7    pushed or something, but he's lying about what he did there

8    and whether he wanted to be in there, and he didn't, and how

9    he got in.

10           So does he write to him and say, "Hey, you lied to

11    me.  I'm done with you"?  He does not.  This information

12    does not alter his interactions with Mr. Hiles one bit.

13           On January 9th at 6:53 p.m. after the conversation

14    with Shepherd Mr. Hiles reaches out to Riley and says:

15    Happy Law Enforcement Day.

16           And on January 10th they keep talking.  They send

17    each other pictures.  They have conversations again about

18    fishing, pictures of fishing.

19           And on January 12th they're still going back and

20    forth about all of their fishing information, who catches

21    what, where they caught it.  This is now three days after

22    he's known that he was being lied to about how he ended

23    up in the building, why he ended up in the building,

24    what he did in the building, and it has no impact on his

25    ability or desire to continue to chitchat and be friendly

1     with Mr. Hiles.

2             And this goes on, and at some point they do have a

3     conversation about Mr. Riley getting Mr. Hiles's help to set

4     up some kind of a fishing YouTube channel, and he happens to

5     comment in there at 10:29 on January 12th:  It's going to be

6     an arduous process.  I'm a computer retard.  So save that

7     piece of information.

8             January 12th they're still talking away about

9     fishing and the best kind of boat, and they also start with

10    some personal conversations relating about being parents,

11    relating about learning disabilities, and they're being very

12    open and friendly and supportive with each other.

13            And by January 13th, Mr. Hiles is still talking

14    about, you know, people are going to get charged, but I

15    didn't do anything.

16            Mr. Riley tells him at 5:12 p.m. on January 13th:

17    I enjoyed watching some of your videos.

18            Still talking about enjoying him and being buddies

19    with him and fishing, and he's not put off by any of the

20    information he learned on January 9th at all.

21            He does ask him on January 13th, now the next day,

22    at 5:57 p.m.:  Do you know Ben Shepherd?

23            I'm curious as to why Riley would bring that up

24    because maybe he wants to know if Hiles knows about the fact

25    that Shepherd is sharing the video.

1           But then we get to January 16th, and Mr. Hiles

2   sends Mr. Riley an article about Hiles possibly being

3   charged, and on January 16th Mr. Riley says to Mr. Hiles at

4   11:14 a.m.:  They're arresting dozens of people a day,

5   everyone that was in the building engaged in violent acts or

6   destruction of property.  And they're all being charged

7   federally with felonies.

8           Now he's saying everyone who was in, not broken

9   in; and his mindset is still exactly the same as it was in

10  the morning on January 7th when he sent the email.  He

11  clearly understands that a grand jury is or will be looking

12  at January 6th stuff because there is only one way that

13  people get federally charged with a felony, and that's with

14  a grand jury.

15          But even that prospect of Hiles being charged

16  doesn't lead the defendant to cut him off.  Mr. Hiles tells

17  him:  I would agree that anyone inside the building should

18  be investigated.  There were a lot of bad people with bad

19  intentions.  There were also people who were just trying to

20  get the hell away from the mob scene inside -- outside like

21  I did, violent mob scene, but this says I was charged.  To

22  be charged I would have to be served an arrest warrant and

23  charged in front of a judge.  That didn't happen.

24          So he's concerned.  He's read in the paper that

25  he's going to be charged.  They're both now thinking he's

1    about to be charged.

2          And what does Mr. Riley say?  Not "Look, I can't

3    really help you because you really haven't been truthful

4    with me."  He says, "Call me."  And they talk for 22 minutes

5    and 43 seconds on January 16th at 11:19 a.m.

6          As the afternoon goes on, 5:37 p.m., Hiles informs

7    Riley that there do appear to be warrants, and he's sending

8    him documents that relate to several misdemeanors.

9          Mr. Riley tells him at 5:39 p.m.:  Federal court

10   is no joke.

11         Mr. Hiles says at 5:40:  I'm relieved to see that

12   the charges are misdemeanors.  I could lose my captain's

13   license over a felony.

14         And at 5:45 p.m. on January 16th Mr. Riley says:

15   Well, that is good news then.

16         In other words, it wasn't a given before then that

17   it wasn't going to be a felony.  And even then he knows he's

18   charged, and he doesn't cut him off.

19         Hiles says:  I understand that I was in the

20   building and must be held accountable for that.

21         He goes on about still like that he went in

22   because that was the fastest, safest way to exit the riot.

23   He's still not telling him the truth.

24         Riley doesn't confront him.  Riley doesn't say,

25   "You did not tell me the truth.  I saw you smoking a joint

1    in there."

2              He says, January 16th, 5:51:  Next time you come

3    to D.C. just call me.  You can stay at my house for free and

4    bring your daughter to the museums.  If you want to see the

5    Capitol building, let's do it legally next time.  I know a

6    guy who can get you a tour.  LOL.

7              He is trying to be friends with this guy still.

8              All right.  And at 5:52 p.m., when Mr. Hiles says

9    on January 16th, "I just hope they don't try to throw me to

10   the wolves with it," Mr. Riley responds right away, "Me

11   too."

12             They're commiserating.  They're buddies.

13             And on January 19th at 8:50 p.m. Mr. Hiles sends

14   Mr. Riley an email:  Good luck tomorrow.  Praying all goes

15   smoothly.  At least hoping you get cleared for duty and to

16   go back.

17             But then on January 20th Hiles -- Mr. Riley talks

18   to Mr. Lagambi again.  At 2:23 p.m. Mr. Riley tells Lagambi,

19   "Jake Hiles got arrested."  He's passing on that

20   information.

21             Mr. Lagambi says to Officer Riley:  I know.  Fuck

22   him.  Jeremy called me the other day about it.  He's an

23   idiot.  Going to lose his business, and he's got a daughter

24   too.

25             And so it's very apparent to Mr. Riley -- from

1   this, a juror could infer that they have different attitudes

2   towards Jacob Hiles, so Mr. Riley starts spinning a little

3   bit of a cover story for Mr. Lagambi's benefit.  "I reached

4   out to him.  I wanted to see what his deal was."  Which

5   doesn't seem to me to be a very accurate description of the

6   email, which I will not read into the record again from the

7   first email that kicked this off on the morning of January

8   7th.

9           And when he says, "I reached out to him, I wanted

10  to see what his deal was," Lagambi says, "Hiles?  What did

11  he say?"

12          And Riley said -- now we're at 2:26 p.m. on

13  January 20th -- I think he's just a moron, not just some

14  militia guy, and he's definitely -- Lagambi says, "He's

15  definitely not a militia guy, just loves the spotlight.

16  Always has."

17          And Riley says:  Yeah, I didn't know him like that

18  other than he's a great fishermen.

19          And then Riley says again at 2:28, just in case

20  Lagambi didn't get it the first time:  I reached out on

21  Instant Messenger just to see what his deal was so I could

22  learn some fishing from him.  And he goes on about people

23  who fished with him before.  Ben Shepherd used to fish with

24  him.

25          And he tells Lagambi again at 2:29:  Yes, I wanted

1    to see what his deal was.  I told him he was going to get

2    arrested, which is not exactly an accurate description of

3    their communications either.  He says it three times, like a

4    mantra.  He really wants his version to sink in with Mr.

5    Lagambi.

6          Then he does say at 2:32 p.m.:  I told him to take

7    his shit down.  He tried to justify being there.  I was like

8    dude, you can tell it to the judge.  He hits me up like

9    every day now.  I think he's a lonely guy.  Still, I'd like

10   to learn some fishing from him.

11          And he's acting like it's Mr. Hiles now who is

12   initiating all the communications and he's not his friend at

13   all, which is not exactly accurate compared to what we've

14   just read and gone through to this point.

15          Finally we get -- after they go back and forth

16   with them talking about how the day went, and Riley being

17   able to go back to work, on January 20, 2021, at 6:49 p.m.

18   Mr. Hiles says to Riley:  The FBI was very curious that I've

19   been speaking to you.  If they haven't already asked you

20   about me, they're gonna.  And then he says:  They took my

21   phone and downloaded everything.

22          Riley says to him:  That's fine.

23          And Hiles said:  That's what I told them.  I said

24   if anything good came of all this, I got a new buddy out of

25   this.

1        At this point, the next thing that happens time-

2   wise is at 6:58 p.m. Mr. Riley hears from Ben Shepherd again

3   on January 20th who says:  Looks like Jake got arrested.

4   He's definitely not the brightest bulb, and -- I'm sorry,

5   Riley says that to Ben Shepherd:  It looks like Jake got

6   arrested.  He's definitely not the brightest bulb.

7        Shepherd asked him some questions.  And Riley says

8   at 7:04 p.m.:  No, I think he got the message.  I texted him

9   just a little bit to see what his deal was, telling another

10  person the fake story and then make sure he wasn't like a

11  straight-up militia guy.  Ultimately I think he's just a

12  moron.  I would have reported him, but I knew he was going

13  to get busted anyway.  I know he's a good fishermen.  I kind

14  of feel sorry for him.

15       And then Mr. Riley says to Mr. Shepherd at 7:08

16  p.m.:  Everyone who was in the building that day will get

17  locked up as they should, even if they were peaceful.

18       7:10 p.m. January 20th he says to Mr. Shepherd:

19  Yes, he thinks we're buddies now, but truthfully I don't

20  think I could ever hang out with him.  Way too radical and

21  not a bright guy.  I thought everyone was getting charged

22  with felonies.

23       He's still saying it.  He can't possibly say that

24  no juror could infer that he was thinking about felonies

25  since the beginning because he is still thinking about

1   felonies even at this point.  So I think it's contrary to

2   the strained legal theory that the defense is putting

3   forward, that a juror could only conclude that he was

4   thinking about misdemeanors.  And this notion that he's

5   telling Shepherd "I couldn't possibly ever hang out with

6   him, he's way too radical" is obviously not supported by all

7   of the communications back and forth about when we are going

8   to hang out, when are we going to fish?

9           So that's what's going on.

10          And then, after he's finished talking to

11  Mr. Shepherd at 7:12 p.m., he waits until the next morning,

12  7:16 a.m., and he writes an email to Mr. Hiles.

13          January 21, 2021:  Hey, Jake, another mutual

14  friend was talking about you last night.  I tried to defend

15  you, but then he showed me a video of you in the Capitol

16  smoking weed and acting like a moron.  I have to say I was

17  shocked and dumbfounded since your story of getting pushed

18  in the building with no other choice now seems not only

19  false but a complete lie.  I feel like a moron for believing

20  you.  I originally reached out to you as someone who looked

21  up to you in the fishing arena and because I've seen your

22  numerous posts about being a single dad and how much you

23  care for your daughter.  I was so mad last night I deleted

24  all your posts, but I wanted to text you this morning and

25  let you know that I will no longer be conversing with you.

1          So this email is just a completely false, a juror

2     could easily infer, cover story as to why he deleted all the

3     information.  He has posted this as the only thing he does

4     not delete so that it could be found if anybody finally goes

5     through his Facebook messages or his phone, and it does not

6     begin to accurately describe what actually happened because,

7     as we just went through, he learned that the video -- about

8     the video on January 9th, and it isn't until he finds out

9     that Jake Hiles has told the FBI about him that he starts

10    complaining about it and claims that he just heard about it

11    last night.  So it is obviously false.  Certainly a

12    reasonable juror could infer that it's obviously false.

13         Then on January 25th, just to complete the story,

14    he gets the letter from OPR, and he reaches out to his

15    friend, Papathanasiou, and says at 3:03 p.m. on January

16    25th:  I was sent a letter from OPR today saying I'm a

17    respondent in the case.

18         The response:  Do you know what it's for?

19         Officer Riley:  If I had to guess, it's for

20    telling that retard I know to take his shit down from the

21    Capitol breach.  But I did it on private message so it

22    should be like a private conversation, but who knows?

23         So it shows you that when he was deleting things

24    he still thought -- maybe unsuccessfully -- he thought that

25    that might actually make the information unavailable.  He

1    never thought he was going to get caught, but he knew it was

2    a problem because the first time he finds out he's in any

3    kind of trouble that's the trouble he thinks he's in.

4           And then he shares, "This was my last text to

5    him," and gives him the cover story text.  And then he says,

6    "I wonder what kind of trouble I am in."

7           So that's the evidence in the case from which the

8    jury was allowed to draw reasonable inferences, and based on

9    that I'm going to deny the motion for judgment of acquittal

10   pursuant to Rule 29 as to Count 1 and Count 2.

11          I do want to note, though, that I think that's a

12   very different question from whether it would be a

13   productive use of the government's resources, the defense

14   resources, and the court resources to retry Count 1 when the

15   defendant, who already had an otherwise unblemished record

16   as a law enforcement officer, is already facing sentencing

17   on Count 2, a felony charging that he acted corruptly.  The

18   counts would likely be combined for Sentencing Guidelines

19   purposes.  The conduct is all related, and the defendant has

20   no prior criminal record.

21          It's not my decision to make, but it seems prudent

22   to consider the avalanche of January 6th cases that have

23   everyone fully occupied and the avalanche that's about to

24   come and the fact that all these facts are in the record

25   already.

1              That's not the only motion I have to rule on.  I

2      have to rule on the defendant's motion for a new trial,

3      Docket 87, which was opposed at Docket 88, and there was a

4      reply filed at Docket 90.

5              The theory is I think that there is no evidence in

6      the end that he was indicted by the January 6th breach grand

7      jury that he allegedly obstructed, and the agent didn't

8      actually testify in that grand jury when he was indicted.

9              But the issue is not which grand jury indicted him

10     or where the agent testified.  The issue is was there a

11     foreseeable grand jury proceeding on January 20th, the date

12     he deleted the communications and allegedly intended to

13     obstruct the proceeding?  It doesn't matter if his

14     indictment, based on that conduct, was ultimately presented

15     to a different grand jury, and the defendant hasn't pointed

16     to any case law or statute that says otherwise.

17             I think throughout the case the defense has

18     somewhat overstated or misapprehended the law arising out of

19     *Arthur Anderson* at 544 at US 696.  That case held that the

20     jury instruction given in the trial that led to the appeal

21     for the "corruptly" element did not convey the elements.

22             The case arose out of the collapse of Enron.

23     After the 2001 revelations of potential accounting

24     irregularities, there were civil lawsuits and some SEC

25     investigations anticipated, and the company made the

1    decision to ensure compliance with its preexisting document

2    retention policy.  And so the indictment alleged that the

3    destruction of these materials was to withhold them from

4    official proceedings, namely regulatory and criminal

5    proceedings.

6           And the Court took pains -- the Supreme Court --

7    to say, at Page 704, that withholding documents isn't always

8    criminal.  Sometimes it could be in connection with legal

9    advice or the exercise of a privilege, and it's not wrongful

10   for a manager to instruct his employees to comply with the

11   valid document retention policy under ordinary

12   circumstances.

13          So it was important, then, that this had been done

14   knowingly and corruptly, and the Court explained that

15   "knowingly" in the statute modifies "corruptly persuades."

16   "Knowledge" means awareness and consciousness.  "Corrupt"

17   means wrongful or immoral.  And therefore, the Supreme Court

18   said at Page 706, you have to have a consciousness of

19   wrongdoing.

20          And the problem was that the jury instruction in

21   that case had simply failed to convey that.  It altered the

22   model jury instruction language to take out "dishonestly"

23   and to say it was enough for petitioner to have intended to

24   subvert, undermine, or impede government fact-finding, and

25   so the Court found there that the jury instructions failed

1    to accomplish the limiting function of the word "corruptly,"

2    but there is no such error in this case.

3              The Supreme Court went on to identify another

4    error, though, in the *Arthur Anderson* prosecution at Page

5    707.  It said the jury instructions led the jury to believe

6    that it didn't have to find any nexus between the persuasion

7    and any particular proceeding.

8              That's also not a problem found in our case.  Our

9    jury was fully instructed on that point with that law in

10   mind.

11             The Supreme Court said in *Arthur Anderson* at Page

12   708, "It's one thing to say it need not be pending or

13   instituted, but quite another to say a proceeding need not

14   even be foreseen."  It can't be knowing and corrupt

15   persuasion if you don't have a foreseeable official

16   proceeding in mind in which the documents might be material.

17             We do not have that problem in this case.  The

18   evidence supports an inference that at the time the

19   defendant urged Jacob Hiles to take down the information on

20   Facebook about going inside, federal grand jury -- federal

21   criminal charges brought by a grand jury were foreseeable,

22   and, for purposes of the new trial motion, the evidence

23   supported a fair inference that at that point the defendant

24   could and did foresee that a grand jury could be looking

25   into obstruction of justice on his part.

1    For example, on January 16th, when he told

2 Mr. Hiles -- when he was told that Mr. Hiles was being

3 charged, he said:  They're arresting dozens of people a day,

4 everyone that was in the building, engaged in violent acts

5 or destruction of property.  And they're all being charged

6 federally with felonies.

7    The way to accomplish that is with a grand jury,

8 so the jury could fairly infer that the defendant knew or

9 foresaw that a grand jury was investigating January 6th-

10 related offenses.

11    *Arthur Anderson* cited *Aquilar* at 515 US at Page

12 599, which is also of relevance in our case.  In that case

13 the defendant lied to an FBI agent, and all the government

14 had shown was that the agent might or might not testify

15 before a grand jury.  And the Court held that's not enough.

16 You need a nexus between the obstructive act and the

17 proceeding, knowledge that your actions are likely to affect

18 it.  And I agree, you need that, and that's why our jury was

19 specifically instructed on that point.

20    The defendant, though, insists that the government

21 was obligated to allege and prove the nexus with the degree

22 of granularity that does not appear in the case law.  Yes,

23 we had to prove that he was thinking about a grand jury at

24 the time, but you didn't have to prove he knew exactly when

25 it would be impanelled or when it was impanelled or exactly

1     what the scope of its charter was.

2              Now, I do agree with the defense that some of the

3     government's statements were muddled.  Its presentation of

4     its own case appeared to be marked with a surprising level

5     of disorganization and confusion.  But that isn't the test

6     for a motion for a new trial.

7              Under Federal Rule of Criminal Procedure 33(a) and

8     upon the defendant's motion, "the Court may vacate any

9     judgment and grant a new trial if the interest of justice so

10    requires."  *United States vs. Wheeler*, 7:53 F. 3d 200, the

11    D.C. Circuit said, "Trial courts enjoy broad discretion in

12    ruling on a motion for a new trial."

13             However, it said, "granting a new trial motion is

14    warranted only in those limited circumstances where a

15    serious miscarriage of justice may have occurred.  It said

16    that citing *United States vs. Rogers* at 918 F. 2d 207 at

17    Page 213, all from the Circuit.

18             And the Circuit said in *U.S. vs. Mangieri*, 694 F.

19    2d at 1270, that the defendant bears the burden of showing

20    that a new trial is justified.

21             And the defendant puts the standard accurately on

22    Page 16 of his own motion.  He says, "In order to warrant a

23    new trial, the evidence must preponderate heavily against

24    the verdict such that it would be a miscarriage of justice

25    to let the verdict stand," and he quotes *United States vs.*

1   *Howard* from this district at 245 F. Supp. 2d 24.

2           The defendant goes on, and he wrote:  In making

3   its determination, the Court weighs the evidence and

4   evaluates the witnesses' credibility and decides whether a

5   serious miscarriage of justice may have occurred.  And he

6   cites *United States vs. Rogers*, 918 F. 2d 207 at 213.

7           And the defendant also quotes the *Safavian* opinion

8   from this district that says, "Grounds for granting such a

9   motion can include a wide variety of errors, including where

10  the Court finds that the weight of the evidence is such that

11  the verdict constitutes a miscarriage of justice."

12          The problem is at the end of the day the defense

13  does not do much to connect its indignation to that

14  standard.

15          While the evidence regarding the nature of the

16  grand jury and how the agent, who was a member of the

17  January 6th task force at the Washington Field Office and

18  likely attended regular meetings about where the

19  investigations and the prosecutions were going, and while

20  this testimony could have been more fulsome, I don't see how

21  that bears on the sufficiency of the evidence or the

22  legality of the trial or the conviction.

23          The lengthy quotes from the transcript do not

24  reflect well on the government.  There was a lot of hopping

25  around the courtroom and rushed conferences and surprising

1   lapses of decorum and professionalism.  But the issue is was

2   the verdict inconsistent with the weight of the evidence?

3   And I find that it was not and, therefore, do not know why

4   it would be appropriate to call for a new trial or to give

5   the government the opportunity to do a better job.

6          As the government points out on Page 5 of its

7   opposition, the evidence included the following:

8          Special Agent Hart testified most of the people

9   who entered the building on January 6th were not arrested

10  that day.  A massive criminal investigation began as they

11  had to recall FBI agents on leave, and it was one of the

12  largest criminal investigations ever conducted by the FBI.

13         But as the jury was instructed, you can't charge

14  without the prosecutor and without the grand jury.

15         Special Agent Hart said that the investigation

16  involved a grand jury.  It issued subpoenas and summoned

17  witnesses.  It accepted evidence and testimony, and it could

18  vote and make a final determination as to what charges would

19  be brought.  And during his cross-examination he said that

20  dozens of agents appeared before the grand jury.

21         He also said that the first grand jury impanelled

22  to consider January 6th evidence was impanelled on January

23  8th, and there is still one sitting to this day.

24         The defendant suggests he could not possibly have

25  been found guilty of Count 2 because he provided an innocent

1    explanation of why he deleted his communications with Jacob

2    Hiles.

3         But the jury was not required to credit that

4    explanation, and the explanation could easily and reasonably

5    have been found to be contrary to the facts as I noted

6    already.

7         Indeed, the creation of a false narrative is

8    consistent with his other attempts to advance a false

9    narrative.  "Oh, I just reached out to see what his deal

10   was," whatever that means.  So that one is really a

11   nonstarter in terms of a motion for a new trial.

12        The defendant also says on Page 4 of the motion:

13   As for a potential investigation of himself, Officer Riley

14   could not have known or believed that by deleting his own

15   direct messages he could impair a grand jury resulting from

16   the January 6th breach of the U.S. Capitol.  Even assuming

17   Officer Riley believed he had committed a crime, which there

18   is absolutely no evidence to support, he had already been

19   told by Hiles that the government had secured the contents

20   of Hiles's cell phone negating any belief that he could

21   impair the grand jury's ability to obtain his direct

22   messages with Hiles.

23        Again, while the defense could fairly argue, and

24   did, that those circumstances could give rise to reasons to

25   doubt, that isn't the same thing as an absence of the

1    necessary intent.  The jury unanimously did not buy it.

2          Similarly, the argument that, well, I didn't tell

3    Hiles to delete anything, at least not after I remonstrated

4    with him for two days to take down the part about being

5    inside the building, that was also fair grist for argument,

6    but it doesn't compel a finding that he didn't intend to

7    obstruct justice when he deleted everything from his phone.

8    He who thought that private messages were private and

9    deleting deleted things.

10          On January 25th, when he thought he was under

11    investigation by OPR, he mentioned the fact that they'd

12    exchanged private messages instead of posts.  One could

13    easily infer that several days earlier, when he deleted his

14    messages, he thought he was making them more difficult for a

15    grand jury to obtain.  And if he thought the phone

16    information was so readily available, as the defense argued,

17    then why did he delete it?

18          As the government put it on Page 13:  The

19    defendant was a United States Capitol police officer with

20    more than 25 years of criminal law enforcement experience.

21    He knew that a massive federal investigation into January

22    6th was underway, and he knew -- in fact, he learned on the

23    very day he deleted his communications -- that the FBI had

24    been interested to learn that a U.S. Capitol police officer

25    had been talking with a rioter.

1           The defendant tries to make a great deal out of

2      the fact that the grand jury that ultimately indicted him

3      wasn't the first one immediately impanelled after January

4      6th, and it wasn't the one the agent appeared before.  But

5      the law cannot be that to establish the nexus requirement

6      one must contemplate the existence of a particular grand

7      jury impanelment on a particular date because that is never

8      public information.  It's enough that he contemplated that a

9      federal grand jury was looking into January 6th-related

10     crime, and that once his communications with Hiles became

11     known to federal investigators, his potential obstruction of

12     justice involving Hiles would be the subject of such a

13     proceeding.

14           In sum, based upon the recitation of the evidence

15     I've just completed and my ability to observe the witnesses

16     and their credibility at trial, I do not share the

17     defendant's view that a miscarriage of justice has taken

18     place on those grounds or any other.  I do not agree with

19     his conclusion on Page 4 that the evidence underlying the

20     guilty verdict weighs heavily in support of acquittal or

21     that it preponderates heavily against the verdict.

22           I agree with the defendant that the prosecutors'

23     outrage and disdain is not enough by itself to sustain a

24     verdict, but neither does his outrage and disdain on the

25     part of the defendant satisfy his burden to establish the

1    need for a new trial under Rule 33; and, therefore, that

2    motion will also be denied.

3          With that, what I believe we need to do is find

4    out from the government ultimately what it's planning to do

5    with Count 1 and set a sentencing date.

6          Does the government know at this time which way

7    it's planning to proceed with respect to Count 1?

8          MR. HOWLAND:  We don't know exactly what we intend

9    to do with Count 1, although I suspect -- I will certainly

10   take Your Honor's admonitions back to the office, and they

11   will take them into consideration.

12         THE COURT:  I mean, at some point when a plea

13   offer was made and people were considering what the

14   guidelines would do in this case, you know, there's a

15   question of whether the guidelines can combine the two

16   counts anyway for sentencing purposes, so -- and it's all

17   the same evidence.

18         So I don't know.  You have to do what you think is

19   right, and we'll wait to hear.  But you've had a long time

20   to think about it already, and so when can you tell us?

21         MR. HOWLAND:  I can -- I represent that I will

22   take it back to my supervisors immediately, and we will let

23   the Court know certainly in the next couple of weeks.

24         Although, I mean, as I'm thinking about it, I

25   don't -- I mean, if there was some issue on appeal I don't

1    know if the office would want to bind itself.  If I could

2    have a couple of weeks to let the Court know?

3                THE COURT:  Well, generally -- I mean, don't we

4    decide that before we -- we're going to sentence him and

5    then you're going to say, "Yeah, maybe we're going to try

6    him again?"

7                I think if he gets sentenced -- I think you need

8    to decide before we sentence him, don't you?

9                MR. HOWLAND:  That's probably right.  And so if I

10   could just have a couple of weeks, Your Honor, I would -- or

11   if Your Honor wants an answer -- when would the Court like

12   to know?  How about that?

13               THE COURT:  There you go.  Well, I think what we

14   should do is go ahead and get a presentence report going; so

15   I think we ought to set a sentencing date, and then we're

16   going to set a date for you to let us know.  And depending

17   on what you say, if we have to change the sentencing date,

18   we'll do that.  So let me just pull up the calendar.

19               Are you planning to handle the sentencing, too, or

20   the lawyers who actually --

21               MR. HOWLAND:  Yes, Your Honor, I will be handling

22   the sentencing as well.

23               MR. MACCHIAROLI:  Your Honor, on behalf of

24   Mr. Riley, I would request the government to give its answer

25   in a week.  I don't want Mr. Riley to go through a process

1    of a presentence investigation interview being interviewed

2    when there's the possibility that the government may still

3    recharge him on Count 1.

4           Even though it was weeks since trial, it was a

5    short government presentation of about a day.  The Court has

6    thoroughly summarized all the evidence, more than the

7    government even did in its opening or closing.  I think

8    there should be no doubt as to what the government's

9    position is on this issue, and I think a week is sufficient

10   time to make that decision.

11          THE COURT:  Well, given the fact that we're

12   rolling right into Christmas and the potential first

13   snowflakes of the year, which throw everyone into a complete

14   panic, I'll be a little bit more generous than that, but I

15   agree with you that we need to know.  But I also think that

16   if I set a sentencing date 90 days out, they're not going to

17   be doing the presentence interview with him in the next two

18   weeks or so.  I just want to get them -- get this in their

19   queue because they are very overworked.

20          So I would say that the government needs to file a

21   notice by Friday, January 6th, and let us know what's going

22   on, and I think that still gives us plenty of time.

23          And if probation reaches out to schedule an

24   interview with him before then, I don't have any problem

25   with you putting it off, but I really doubt that's going to

1    happen given what the probation office is facing right now.

2              MR. MACCHIAROLI:  Your Honor, I agree with you in

3    theory, but it's been surprising.  The probation officers

4    have been very diligent.  They've been letting me know of

5    dates within ten days, and I can't even -- I'm not even

6    ready to start the presentence report in ten days.

7              But I will let them know that our position will be

8    that we're not going to have the interview until the

9    government's made its decision.

10             THE COURT:  All right.  And, you know, we can set

11   the date 90 days after January 6th, which would put us into

12   April.  Is that right, Mr. Haley?

13             THE COURTROOM DEPUTY:  Yes, Your Honor, April 6th

14   at the earliest date, Your Honor.

15             THE COURT:  Okay.  What if we set this down for

16   April 12th or 13th, 9:30 in the morning, for sentencing?

17             MR. MACCHIAROLI:  Either day is good for the

18   defense.

19             THE COURT:  All right.  I'll set it for April

20   13th, and then I would want sentencing memoranda on April

21   6th.

22             THE COURTROOM DEPUTY:  Did you say 9:30, Your

23   Honor?

24             THE COURT:  Yes, 9:30 in the morning.

25             Mr. Macchiaroli, I think it's most helpful for me,

1   if people write letters, if they go to you and then you

2   submit them all together on the -- I think you've had

3   another sentencing with me, and it's just easier.  Because

4   otherwise people just write me letters, and I'm going to say

5   "leave to file" and they're going to end up on the docket

6   anyway.

7              MR. MACCHIAROLI:  Absolutely, Your Honor.

8              THE COURT:  All right.  Is there anything further

9   we need to take up right now?

10              MR. HOWLAND:  Nothing from the government, Your

11   Honor.

12              MR. MACCHIAROLI:  Nothing from the defense, Your

13   Honor.

14              THE COURT:  All right.  I hope everybody has a

15   very pleasant holiday.

16                   (Whereupon the hearing was

17                    concluded at 3:14 p.m.)

18

19

20

21

22

23

24

25

1                  <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3                  I, LISA A. MOREIRA, RDR, CRR, do hereby

4       certify that the above and foregoing constitutes a true and

5       accurate transcript of my stenographic notes and is a full,

6       true and complete transcript of the proceedings to the best

7       of my ability.

8           Dated this 5th day of January, 2023.

9

10                                      <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                         Official Court Reporter
11                                       United States Courthouse
                                         Room 6718
12                                       333 Constitution Avenue, NW
                                         Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25