**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA :** | | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No: 21-cr-628 (ABJ)** |
| **MICHAEL ANGELO RILEY,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

When allegiance to law and order mattered most, Defendant Michael Angelo Riley, a U.S. Capitol Police Officer with 25 years of experience, betrayed his oath to protect and defend the Constitution and undermined the very institutions he was sworn to protect. On January 6, 2021, a dark day in U.S. history, a mass of rioters attacked the U.S. Capitol in a violent attempt to subvert our country's democratic institutions and disrupt the peaceful transfer of power. Jacob Hiles, wearing protective goggles and a Kevlar vest, was one of the rioters. Defendant Riley was on scene on January 6 and saw first-hand the extent of the violence, damage, and harm inflicted by the rioters on his fellow officers. But the very next day, the Defendant tried to help Hiles destroy evidence and avoid prosecution. And two weeks later, when the Defendant learned that he, too, was under investigation, he continued his obstruction, destroying evidence of his own criminal conduct and concocting a false story to conceal his actions. For this conduct, this Court should impose a sentence of 27 months of incarceration, 24 months of supervised release, a fine within the appropriate United States Sentencing Guidelines ("U.S.S.G") range, and the mandatory $100 special assessment.

## I.      **PROCEDURAL BACKGROUND**

On October 14, 2021, a federal grand jury in the District of Columbia returned an indictment charging Defendant with two counts of Obstruction of Justice, in violation of 18 U.S.C. § 1512(b)(2)(B) (Count One) and 18 U.S.C. § 1512(c)(1) (Count Two).  ECF No. 1.  Following a seven-day trial in October 2022, the jury convicted Defendant of Count Two but was unable to reach a unanimous verdict as to Count One.  10.27.22 Tr. at 4-5; 10.28.22 Tr. at 12.[1]

## II.     **FACTUAL BACKGROUND**

The charges arose out of Defendant's efforts to obstruct the criminal investigation surrounding the events of January 6, 2021. That day, a mass of rioters stormed and breached the United States Capitol in an attempt to disrupt the peaceful transfer of power. 10.18.22 Tr. at 131-32. Seven individuals, including three law enforcement officers, lost their lives as a result of the events of January 6. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021) at 1.[2] Rioters injured more than a hundred members of law enforcement, sometimes using dangerous weapons. *Id*. In addition to the violence, the rioters stole, vandalized, and caused extensive property damage to the Capitol.

## III.    **THE EVIDENCE AT TRIAL**

Defendant, a United States Capitol Police Officer with more than 25 years' experience, worked a tour of duty on January 6, 2021. 10.24.22 Tr. at 13. Along with his K-9 partner,

---

[1] This memorandum will cite to the transcripts by the date of the proceeding followed by the page number referenced.

[2] Report *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf.

Defendant responded to investigate a report of an explosive device, as well as provided assistance to an officer who had sustained an injury. *Id*. at 14-19, 25-26. Defendant, however, knew of the events unfolding at the Capitol. *Id*. at 23. As he later told the FBI, he watched a "fellow police officer" "almost die" in his arms that day.[3] At the end of the day, after assisting with a protective sweep of the Capitol, Defendant went home. *Id*. at 35. According to Defendant, he found the events of January 6 "upsetting." *Id*. The following day, January 7, Defendant expressed anger and a recognition that the rioters' actions had been criminal in a public Facebook post:



**GOVERNMENT EXHIBIT**
**307**
**Amended**

**Posted**   2021-01-07 16:53:44 UTC
**Status**   Every protestor that assaulted an officer yesterday, commited property damage, and broke in to the Capitol building should be charged federally in District Court.  If we don't send a message it will surely happen again.
**Mobile**   false
**Id**   3757674984276276

10.24.22 Tr. at 33-34; Gov't Ex. 307 (amended).

Defendant's purported outrage was short-lived. Within two hours of his public post, Defendant was alerted to different public post by Jacob Hiles,[4] one of Defendant's connections on Facebook, and a well-known fisherman whom Defendant had seen on "several YouTube videos." 10.24.22 Tr. at 37. In the post, Hiles documented his participation in the riot and included a

---

[3] A transcript of Defendant's August 31, 2021, recorded interview with FBI agents is attached to this memorandum as Attachment A.

[4] Hiles was eventually charged, pled guilty for his conduct, and sentenced under seal by this Court in late 2021. *See United States v. Hiles*, Case No. 21-cr-155-ABJ.

lengthy, unsettling video showing violent confrontations between rioters trying to breach the Capitol and law enforcement officers trying to hold the line:



Gov't Exs. 302, 303, 201a, 201.1. According to Hiles, the police "weren't really prepared, not because of the crowd being overwhelming, but because they were literally not prepared. Many of the officers didn't have masks and goggles." *Id*. Hiles—who showed up on January 6 wearing goggles and a Kevlar vest—also spread false information that rioters who had vandalized the building were "paid protesters." *Id*.; 10.24.22 Tr. at 163.

Despite having never met or communicated with Hiles, Defendant messaged him, identified himself as a Capitol Police officer, offered support, and told Hiles to take down the portion of his post that indicated Hiles had entered the Capitol, precisely because Defendant knew such evidence was relevant to a pending investigation and could potentially be used to prosecute him: "Hey Jake, im a capitol police officer who agrees with your political stance. Take down the part about being in the building they are currently investigating and everyone who was in the building is going to be charged. Just looking out!" Gov't Ex. 202a. When asked why he chose to send the message privately, Defendant could only muster: "Just because." 10.24.22 Tr. at 84.

Defendant and Hiles continued to exchange Facebook messages. The same day Defendant told him to "[t]ake down" the incriminating parts of the Facebook post, Hiles responded, "Investigate me however youd like and thank you for the heads up." Gov't Ex. 202a at 2. Hiles also forwarded videos showing law enforcement being attacked, to which Defendant responded, "I get it. . . it was a total sh*t show!!!! Just wanted to give you a head's up." *Id*. at 4. Defendant continued to offer advice to Hiles regarding his illegal conduct, reiterating his awareness of the ongoing investigation targeting the rioters, such as Hiles, who had entered the Capitol: "The only thing I can see is if you went in the building and they have proof you will be charged. You could always articulate that you have no where to go, but thats for court," "Personally i don't know what they have decided, just know our guys and the fbi are going through everything." *Id*. at 7-8.

Throughout the course of their private messages, Defendant repeatedly emphasized his position as a Capitol Police Officer who had "been doing this for 26 years," Gov't Ex. 202a at 8, and that by virtue of his position, he had access to non-public information about the scope of the riot. In one message, Defendant called January 6 a "sickening day" and explained, "There's so much other sh*t I cant tell you on here or show you pictures of, but lets just say there were straight

up acts of terrorism yesterday." *Id*. at 9. In another, Defendant reminded Hiles, "im not at liberty to say the actual specifics of her shooting . . . Remember when the building was breached there was a joint session going on. Number 2 through 5 in our government was in the building at the time. Also several rooms in that building are critical to national security. Truthfully…its absolutely amazing more people weren't shot." *Id*. at 5. Defendant also played up his relationship with his "good friend," the Chief of the Capitol Police force. *Id*. at 10. In rebuttal to Hiles's theory that law enforcement had been "intentionally underprepared by design," Defendant said he "just talked with [the] Chief" and that "preparedness for these demonstrations is based on intelligence." Gov't Ex. 202a at 21.

Defendant also emphasized his knowledge of court processes, telling Hiles that he used to "lead the department in arrests" and had been named "officer of the year one year [and] . . . national officer of the month" in February 2011. Gov't Ex. 202a at 18. When Hiles described certain January 6 arrests as "fake news," including his own, Defendant again referred to his inside knowledge of the investigation, responding that everyone who was "in the building, engaged in violent acts, or destruction of property" was being "charged federally with felonies." *Id*. at 48. And as Defendant knew and explained to Hiles, "Federal court is no joke." *Id*. at 49.

Defendant remained friendly with Hiles in the weeks following the January 6 attack. On January 9, Riley received a video showing Hiles smoking pot inside the Capitol. Gov't Ex. 306.1, 306a, 202a at 37. Riley expressed no concern about this to Hiles. In fact, three days later on January 12, Defendant and Hiles talked about going fishing together. Gov't Ex. 202a at 37-40.

On January 16, Hiles learned that he had been charged. Gov't Ex. 202a at 48. When Hiles messaged Defendant and expressed confusion about the charges, Defendant offered his expertise: "Call me." Gov't Ex. 202a at 48. Their conversation lasted for 23 minutes. Although the exact

contents of the conversation are unclear, within hours, Hiles told two individuals that he had spoken to "capitol police" and that any charges against him would likely only involve trespassing. PSR ¶ 18(e). Later the same day, Hiles forwarded his charging documents to Defendant. Defendant's reply spoke volumes:



MR   Next time you want to come to DC just call me, you can stay at my house on the shore for free and bring your daughter to the museums. If you want to see the capitol building, lets do it legally next time... I know a guy who can get you a tour...lol

Jan 16, 2021
5:51:03 PM

Gov't Exs. 102; 202a at 50.

Notwithstanding his awareness that Hiles faced federal charges, Defendant's friendly exchanges with him continued. In one exchange, Hiles told Defendant he had turned himself in and "[s]pent the rest of the day doing sh*t that happens when you do dumb sh*t." Gov't Ex. 202a at 52. Defendant responded, "Lol…NO MORE DUMB SH*T!" *Id.*

Those exchanges stopped, however, when Hiles told Defendant he had spoken with the FBI and Defendant learned the FBI had obtained evidence from Hiles's phone: "The fbi was very curious that I had been speaking to you if they havent already asked you about me they are gonna. They took my phone and downloaded everything." Gov't Ex. 202a at 52. When Defendant responded, "That's fine," Hiles agreed: "That's what I told them. I said if anything good came of all this, I got a new buddy out of it." *Id.* But Defendant knew the FBI investigating him was not "fine." Instead, Defendant immediately deleted all of his private messages with Hiles. For this conduct, the jury found Defendant guilty of obstruction.

The following morning, Defendant concocted an elaborate and false narrative regarding his communications with Hiles:



Michael Angelo Riley

> Hey Jake, another mutual friend was talking about you last night. I tried to defend you but then he showed me a video of you in the Capitol smoking weed and acting like a moron. I have to say, i was shocked and dumbfounded, since your story of getting pushed in the building with no other choice now seems not only false but is a complete lie.  I feel like a moron for believing you.  I originally reached out to you as someone who looked up to you in the fishing arena and because i have seen your numerous posts about being a single dad and how much you cared for your daughter.  I was so mad last night I deleted all your post, but i wanted to text you this morning and let you know that I will no longer be conversing with you.

Jan 21, 2021
7:16:23 AM

Gov't Ex. 202a at 53; Gov't Ex. 304a. Defendant feigned that he was "shocked and dumbfounded" by a video had had seen the night before. In reality, as Defendant knew when he fabricated that false narrative, Defendant had known for more than a week that Hiles had been inside the Capitol illegally, "smoking weed and acting like a moron." Defendant's thinly-veiled cover-story was the only message to Hiles that remained in Defendant's Facebook account when the FBI executed a search warrant. Gov't Ex. 304a. Defendant also initiated a messaging campaign to multiple friends who knew Hiles, telling them he had reached out to "see what his deal was." Gov't Ex. 401 at 12-13; 306a at 3.

On January 25, after learning that he was the subject of an internal USCP investigation, Defendant messaged his union representative. Gov't Ex. 402a. When asked what the investigation might be about, Defendant's response revealed consciousness of his wrongdoing: "if I had to guess

for telling that retard I know to take down his shit from the capitol breach. But I did it on private message so it should be like a private conversation but who knows." *Id*. Defendant continued, "He told me that he told the FBI that he talked to me. Wonder what kind of trouble I'm in." *Id*. Defendant also sent a screen shot of his "shocked and dumbfounded" message to the union representative and explained, misleadingly, that was his last message with Hiles. Gov't Ex. 402a.

Defendant's contempt for the criminal justice system continued throughout trial. He gave materially false testimony to the jury and offered explanations for his conduct that were not credible. With respect to telling Hiles to delete his Facebook post about entering the Capitol, Defendant claimed that he was "[a]bsolutely not" thinking about a grand jury proceeding—this despite messaging Hiles on January 7 that law enforcement "might choose to only charge" certain people and advising that if Hiles "went in the building and [law enforcement] had proof," he would be "charged." 10.24.22 Tr. at 41; Gov't Ex. 202a at 7-8. As this Court noted in its post-trial ruling, Defendant could not "possibly say" he had not been "thinking about felonies since the beginning" of his exchanges with Hiles. 12.19.22 Tr. at 31. Defendant's attempts to explain his rationale for deleting his private messages with Hiles were even less credible. He told the jury he was "extremely upset" because Hiles had told "the FBI that [they] were buddies." 10.24.22 Tr. at 49. Defendant "didn't want people to think that [he] somehow . . . had anything to do" with Hiles entering the Capitol. *Id*. Following several days of deliberation, the jury convicted Defendant of Count 2 and deadlocked as to Count 1. 10.28.22 Tr. at 12.

IV.   **ARGUMENT**

Defendant Michael Angelo Riley fully understood the horrors of January 6. And yet, when the time came for Defendant to hold the line, he sided with a known rioter, a person he had never met or spoken to, because of the rioter's political views and because he happened to be a good

fisherman. When it became clear to him that he was also being investigated, Defendant deliberately destroyed evidence of his misconduct. Compounding his crimes, Defendant tried to deceive the jury in his testimony. In committing his obstructive acts, Defendant not only betrayed his fellow officers; he also betrayed 25 years of public trust placed in him as a Capitol Police Officer. For the reasons set forth below, a within-Guidelines sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

### a.   The Applicable Sentencing Guidelines

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," they are the "starting point and the initial benchmark" for sentencing. *Id*. at 49.

### i.   The Guidelines Calculation

As set forth in the Presentence Investigation Report ("PSR"), Defendant's base offense level for Obstruction of Justice is 14, pursuant to U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") § 2J1.2(a). PSR ¶ 28. Though the PSR calculates Defendant's Guidelines range as 15-21 months of incarceration, PSR ¶ 88, as noted in the government's objections to the PSR, and explained in more detail below, the government submits that U.S.S.G.§ 3B1.3, Abuse of Position of Trust, and U.S.S.G. § 3C1.1, Obstruction of Justice, apply to Defendant's conduct. In fashioning an appropriate sentence, the Guidelines instruct the Court to consider the full scope of defendant's conduct, including any relevant conduct, which is defined broadly as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, produced, or willfully caused" by Defendant, including conduct that occurred "during the commission of the offense, in preparation

10

for the offense, or in the course of attempting to avoid detection or responsibility" for the offense. U.S.S.G. § 1B1.3. With the two enhancements included in the PSR calculations, Defendant's base offense level would be 18, with a resulting Guidelines range of 27-33 months.

    ii.  <u>Defendant's Offense Level Should Be Increased Because He Abused His Position of Public Trust.</u>

If Riley were any other criminal defendant who had been convicted of obstructing justice, the Guidelines range as calculated would be appropriate. But Defendant is not any criminal defendant. For 25 years, he occupied a unique position as a Capitol Police officer, the very law enforcement agency charged with protecting the Capitol. Because he abused this position of trust, Defendant should receive a 2-level increase in his base-offense level pursuant to U.S.S.G. § 3B1.3.

As the Government pointed out in its response to the draft PSR, *see* Addendum to PSR p. 24, Defendant abused his position of trust by attempting to obstruct the grand-jury's investigation of the events surrounding January 6. Pursuant to U.S.S.G. § 3B1.3, a two-level enhancement applies "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." In considering the full scope of Defendant's conduct, including relevant conduct, *see* U.S.S.G. § 1B1.3, this Court is not bound by the jury's inability to reach a unanimous verdict as to Count 1 and can make an independent determination by a preponderance of the evidence that Defendant "attempted to obstruct or impede" the grand-jury investigation by telling Hiles to delete evidence of his criminal conduct. *United States v. Watts*, 519 U.S. 148, 156 (1997).

In that respect, Defendant clearly used his position as a Capitol Police officer to facilitate his attempted obstruction. As an initial matter, there is no question that police officers occupy positions of trust. *See United States v. Shyllon*, 10 F.3d 1, 5 (D.C. Cir. 1993). As a result, "the

inquiry in most cases" involving the application of § 3B1.3 to officers is whether the officer used "special knowledge or access to facilitate or conceal the offense." *United States v. Baker*, 82 F.3d 273, 277 (8th Cir. 1996). Here, on his own initiative, without ever having met or spoken to Hiles, Defendant sent a private message instructing him to delete evidence. Recognizing that such an unprompted message might otherwise be ignored, Defendant made sure to identify himself as a Capitol Police Officer. And for obvious reason: to emphasize his experience and lend credibility to his message, as well as signal the urgency of his imperative to "take down" the incriminating part of the post. Defendant acknowledged as much in a recorded interview with law enforcement: "I think the only reason I put [the reference to Capitol Police] in there was because I wanted him to understand that I wasn't just somebody, you know, telling him to take something down. I wanted him to know that, hey, it's my opinion, as a police officer, that it's probably not a good idea to be posting that." Att. A at 29. Subsequent messages with Hiles made clear that Defendant played up his status as a Capitol Officer.[5]

Because Defendant used his status to "facilitate the offense," § 3B1.3 applies. *See United States v. Brockenborrugh*, 575 F.3d 726, 739 (D.C. Cir. 2009) (affirming enhancement when defendant presented himself as a U.S. Marshal and used that representation to induce an unwitting

---

[5] In subsequent messages with Hiles, Defendant repeatedly highlighted his status as a Capitol Police officer and his expertise regarding the criminal justice system. He told Hiles that he had inside knowledge about the "specifics" of January 6 that he could not share or "show . . . pictures of." Gov't Ex. 202a at 6, 8. He referenced charging decisions and indicated that he knew "our guys and the FBI" were conducting the investigation. *Id.* at 8. Defendant reiterated that he had been an officer for "26 years" and told Hiles that his "good friend," the Chief, had resigned. *Id.* at 8, 10, 20. He forwarded the Capitol Police press release regarding an officer fatality. *Id.* at 17. Most critically, when Hiles needed someone with experience to explain criminal charges and the process, Defendant eagerly answered the call. Indeed, the entirety of Defendant's relationship with Hiles was based on Defendant providing Hiles with information about the criminal justice system in exchange for Hiles giving Defendant tips about fishing.

victim to sell property). Although Defendant may not have explicitly flashed his badge, he "took advantage" of his special status in order to try to conceal criminal activity. *United States v. Foreman*, 926 F.2d 792, 795 (9th Cir. 1990) (affirming enhancement when defendant flashed badge to agents at airport in effort to conceal her cocaine possession). Defendant's conduct thus falls within the ambit of § 3B1.3. *See also Shyllon*, 10 F.3d at 5 (upholding enhancement when defendant obtained information by virtue of his position that assisted in committing the crime); *United States v. Romero*, 518 F. App'x 648, 653 (11th Cir. 2013) (non-precedential) (affirming enhancement when defendant "used his position as a police officer to help conceal a crime"); *United States v. Coumaris*, 198 Fed. App'x 9, 11 (D.C. Cir. 2006) (non-precedential) (affirming enhancement when IRS agent used "special credibility" to divert attention from criminal conduct).

### iii. Defendant's Additional Obstruction Should Result in a 2-Level Enhancement.

The Guidelines dictate a two-point increase in the offense level if a defendant "willfully obstructed or impeded, or attempted to obstruct of impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. In addition to Defendant's attempts to induce Hiles to obstruct justice by deleting his public Facebook post, Defendant's elaborate cover story, coupled with his misleading testimony to the jury, constituted additional obstruction under U.S.S.G. § 3C1.1.

Defendant attempted to obstruct the grand-jury investigation by instructing Hiles to delete evidence of his criminal conduct. *Watts*, 519 U.S. at 156. And as the Guidelines explain, "[d]irecting or procuring another person to destroy or conceal evidence that is material to an

official investigation or judicial proceeding" or "attempting to do so" constitutes obstruction. U.S.S.G. § 3C1.1 cmt. n. 4(D). Advising Hiles to delete evidence of his wrongdoing in order to evade criminal penalty falls squarely within the definition of obstructive conduct. *See, e.g., United States v. Alston*, 899 F.3d 135, 151 (2d Cir. 2018); *United States v. Mellen*, 89 Fed. App'x. 268, 270 (D.C. Cir. 2004) (non-precedential) (defendant told coconspirator to lie to investigators and "advised" daughter to destroy evidence). As noted, although the jury deadlocked as to Count 1— apparently by an 11 to 1 vote—this Court is not bound by the jury's inability to reach a verdict. 10.27.22 Tr. at 5.

Defendant's conduct qualifies for the § 3C1.1 enhancement for additional reasons, as well. As the Court noted in its denial of Defendant's post-trial motions, the moment Defendant learned the FBI was investigating him on January 20, he started "spinning a little bit of a cover story." 12.19.22 Tr. at 29-31. Defendant told two friends who also knew Hiles—Vince Lagambi and Ben Shepherd—that he had reached out to Hiles to "see what his deal was." *Id*. As the Court aptly observed, Defendant began to repeat this story "like a mantra." *Id*. Defendant also told Shepherd that Hiles was "way too radical" to "hang out with" and that he thought the rioters were all "getting charged with felonies." *Id*. Defendant's private messages to Hiles told a very different story, however. Defendant repeatedly sought to hang out with Hiles, including by inviting him to stay at Defendant's house "on the shore" for free. And of course, Defendant initially reached out to Hiles, at least in part, because he shared Hiles's political views. Gov't Ex. 202a at 1. Thus, Defendant's story that he sought to understand Hiles's "deal" does not pass muster.

Defendant's cover-story to Hiles expressing purported shock about his conduct is the most glaring example of Defendant's fabrication. As the Court noted, the message was "completely" and "obviously" false. 12.19.22 Tr. at 33. Tellingly, that cover story was the only message

14

Defendant sent to Hiles that remained in Defendant's Facebook account during a later search. And Defendant persisted in his attempts to cover his tracks. When he discussed his interactions with Hiles with his union representative, Defendant conceded that he had been in touch with Hiles and told him to "take down" his post about the Capitol breach. Gov't Ex. 402a. But Defendant quickly pivoted and sent a screen shot of the "shocked and dumbfounded" message. Of course, Defendant failed to mention that he had also deleted all of his private messages with Hiles and that the last text he had sent to Hiles was complete fiction.

Defendant's obstruction continued throughout the trial, as well. Because the phony cover-story message demonstrated Defendant's guilt so powerfully, Defendant needed an explanation to sell to the jury. The one he offered did not hold up. When asked why he had deleted the private Facebook messages with Hiles, Defendant told the jury that he was upset that Hiles had described the two men as "buddies" to the FBI. 10.24.22 Tr. at 49. The trouble with Defendant's testimony? The two men were buddies. The jury rejected the Defendant's self-serving story, perhaps recognizing that the "defendant had the opportunity to hear" the government's case and thus "to tailor his testimony accordingly." *Portuondo v. Agard*, 529 U.S. 61, 63 (2000). Likewise, as the Court noted in its post-trial rulings, Defendant's adamant testimony that he "absolutely [had] not" been thinking about felonies—and therefore a grand jury proceeding—when he initially messaged Hiles (or when he deleted his own Facebook messages, for that matter) was materially false. 12.19 Tr. at 31-32. Put differently, not only was the legal theory proffered by the defense "strained," as the Court put it, *id*. Defendant's testimony in support of it was also materially false.

Defendant's transparent attempts to mislead the jury and avoid accounting for his criminal conduct constituted perjury. *See* U.S.S.G. § 3C1.1, App. Note 4(B) (noting perjury is one type of obstructive conduct to which § 3C1.1 applies). And because he willfully provided "false testimony

15

concerning a material matter" that was not the result of "confusion, mistake, or faulty memory," § 3C1.1 applies. *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. Dunnigan*, 507 U.S. 87, 94, (1993)); *see also United States v. Thundershield*, 474 F.3d 503, 508 (8th Cir. 2007) (affirming § 3C1.1 enhancement when defendant lied during trial). Accordingly, Defendant's base-offense level should be increased by two levels for this reason, as well.[6]

**b.      A Sentence Within the Guidelines Range Appropriately Balances the § 3553(a) Factors**.

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in fashioning an appropriate sentence. With the two additional enhancements properly included in Defendant's U.S.S.G. calculations, the Guidelines range should be 27-33 months of incarceration. As explained below, a 27-month sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

*First*, the nature and circumstances of the offense support a significant sentence. As is well-known, the "violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Although Defendant did not participate in the January 6 attack, his conduct cannot be divorced from the events of that day. And like the rioters, Riley determined that his political beliefs justified his violation of the law. Defendant witnessed the actions of the violent mob first-hand and understood that the breach of the Capitol represented an offense "against morality, civic virtue, and the rule of law." *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021). Indeed,

---

[6] Although the D.C. Circuit previously required proof of perjury for purposes of assessing § 3C1.1 by clear and convincing evidence, the Guidelines were amended and no longer require a heightened burden of proof. *See, e.g., United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)).

Defendant called for the rioters to be prosecuted federally. His decision to willfully obstruct the grand jury investigation by instructing a well-known rioter to delete evidence of criminal conduct and thereafter destroy evidence of his own misconduct is therefore all the more harmful.

Nor was Defendant's conduct a momentary lapse in judgment. Not only did Defendant advise Hiles to obstruct justice, but he did so himself ten days later when he learned the FBI was investigating him. Given Defendant's lengthy career in law enforcement, the nature of his offense reflected a serious breach of his sworn duty to preserve and protect the Constitution against all enemies, foreign and domestic. His egregious conduct warrants a serious sentence.

*Second*, Defendant's sentence should promote the rule of law, provide just punishment, and provide adequate deterrence. 18 U.S.C. § 3553(a)(2)(A) & (B). Each of these factors likewise weighs in favor of a within-Guidelines sentence. Lest there be any mistake: the attack on the U.S. Capitol represented an attack on the rule of law itself. Law enforcement officers are critical to promoting and maintaining the rule of law in this country. Defendant's obstruction of the January 6 investigation exacted significant damage to the ability and credibility of law enforcement officers working to carry out this essential role. Why else would Defendant lie to his friends about his interactions with Hiles? Defendant knew that he had not reached out to Hiles to "see what his deal was." By attempting to assist a known rioter, Defendant betrayed not only his own position but his fellow law enforcement officers.

*Third*, a significant sentence is needed to afford adequate deterrence and to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(2)(B). Sending a strong message is especially important in cases involving public officials engaged in misconduct. Like white-collar crime, public corruption cases are "prime candidates for general deterrence" because they often are "more rational, cool, and calculated than sudden crimes of passion or opportunity." *United*

17

*States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citations omitted).  Of upmost importance, this Court should send the message that law enforcement officers cannot be allowed to let their personal political beliefs drive their behavior.

Moreover, the need for general deterrence is particularly urgent for crimes arising out of January 6th. As this Court has observed, the "heated, inflammatory rhetoric" has not subsided. *See United States v. Young*, 21-cr-291-ABJ, ECF No. 170, at 61-62. Imposing a probationary sentence as recommended by the U.S. Probation Office runs the risk of creating sentencing disparities with other kinds of crimes based on socio-economic status. *See generally United States v. Levinson,* 543 F.3d 190, 201 (3d Cir. 2008); *accord United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006). And of course, conveying to future rioters or would-be mob participants that their actions will have consequences is crucial to ensuring the security of future democratic processes.

*Finally*, Defendant's history and characteristics do not mitigate against the imposition of a significant sentence. The PSR paints a portrait of Defendant as a respected police officer with multiple commendations and no economic hardship. PSR ¶ 80 (discussing Defendant's $300,000 boat); ECF No. 102 at 1-2; PSR ¶ 73. But that history makes Defendant's conduct in the wake of January 6 all the more troubling and difficult to reconcile. Moreover, Defendant's "new status as a convicted felon" and "loss of his police-issued K-9 partner," *id*. are consequences of his conviction of which he was fully aware when he chose to engage in obstructive conduct. The bottom line is that Defendant has been offered a wealth of opportunities in his life, far more than many defendants who appear before this Court. Defendant's history and characteristics cannot explain his willingness to obstruct justice and flaunt the rule of law in pursuit of his political beliefs.

18

## V.     <u>**CONCLUSION**</u>

For the reasons set forth above, the government recommends that the Court impose a Guidelines-compliant sentence of 27 months of incarceration. The government further recommends that the Court impose a 24-month term of supervised release, a fine as set forth in U.S.S.G. § 5E1.2, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     /s/ *Christopher R. Howland*
Christopher R. Howland (DE Bar 5556)
Assistant United States Attorney
Fraud, Public Corruption, and Civil Rights Section
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7106
christopher.howland@usdoj.gov

# **ATTACHMENT A**

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3

 4    - - - - - - - - - - - - - - - - )

 5    UNITED STATES OF AMERICA          *

 6         vs.                         * CASE NO. 2021-R-02694
                                                 21-cr-628
 7    MICHAEL RILEY                     *

 8    - - - - - - - - - - - - - - - - )

 9                    File: 0382.001 USA-002620.wav

10

11

12                         Interview of:

13                      MICHAEL ANGELO RILEY

14

15                     Tuesday, August 31, 2021

16

17

18

19

20    APPEARANCES:

21        SPECIAL AGENT BRANDON MERRIMAN
          SPECIAL AGENT STEPHEN HART
22        BETH

23

24

25
```

1                    P R O C E E D I N G S

2              AGENT MERRIMAN:  This is Special Agent Brandon

3   Merriman with Special Agent Steven Hart.  The date is August

4   31st, 2021.  The time is 11:11.  We are about to conduct a

5   surreptitiously recorded interview of Michael Angelo Riley

6   at his residence in Maryland.

7              (Background noise/conversation among agents.)

8              (Agent Merriman and Agent Hart exit the vehicle

9   and walk to Mr. Riley's house.  Agent Hart knocks on the

10  door.)

11             AGENT HART:  Good morning.

12             BETH:  Hey.  How are you?

13             AGENT HART:  Hey, how's it going?

14             BETH:  Good.

15             MR. RILEY:  Hey.

16             AGENT HART:  Hey.  Mike?

17             MR. RILEY:  Yes, sir.

18             AGENT HART:  Could we chat with you for just a

19  minute?

20             MR. RILEY:  Absolutely.

21             AGENT HART:  Just so you know, we're --

22             MR. RILEY:  Okay.

23             AGENT HART:  I'm Steven Hart.  This is Brandon

24  Merriman.

25             AGENT MERRIMAN:  Brandon Merriman.

```
 1              AGENT HART:  Can we go inside and chat for a bit?

 2              MR. RILEY:  Sure.  Yeah.  Yeah.

 3              AGENT HART:  Okay.  Do you wanna take your dog?

 4              BETH: Okay.

 5              MR. RILEY:  What's this about?

 6              AGENT HART:  We'll talk about it when we get

 7    inside.

 8              (Agent Hart and Agent Merriman enter Mr. Riley's

 9    house.)

10              BETH: (Indiscernible).

11              MR. RILEY:  Sorry, guys.

12              AGENT HART:  Is this your work dog?

13              MR. RILEY:  Yep.  It's dusty.  Come on, Tobes

14    (ph.).

15              BETH:  We're cleaning there.  We're cleaning

16    (indiscernible).

17              MR. RILEY:  You guys want anything to drink, or --

18              AGENT HART: I'm okay.

19              AGENT MERRIMAN:  I'm fine.  Thank you.

20              MR. RILEY:  Every day is my cleaning day

21    (indiscernible).

22              BETH:  That's why I'm staying (indiscernible)

23    around here.

24              MR. RILEY:  Yeah.

25              BETH:  I got breakfast, (indiscernible).
```

4

```
 1              MR. RILEY:  You guys with the Washington field
 2   office or --
 3              AGENT MERRIMAN:  Yes.
 4              AGENT HART:  We are.  We are.
 5              BETH:  (Indiscernible).
 6              MR. RILEY:  Please don't freak out, now.
 7   Please -- he hasn't been outside.
 8              AGENT HART:  It's okay.
 9              MR. RILEY:  Hey.  You want to put him in your
10   room?
11              BETH:  Come here, Tobes.
12              MR. RILEY:  He wants a treat.
13              BETH:  Here, Toby.
14              AGENT MERRIMAN:  Do you want us to wear masks?
15   I'm --
16              MR. RILEY:  Nah, bro.
17              AGENT MERRIMAN:  We're both --
18              AGENT HART:  Yeah, we're vaccinated.
19              AGENT MERRIMAN:  -- vaccinated.
20              MR. RILEY:  We're -- I'm vaccinated.  She's
21   vaccinated.  Everybody's vaccinated except for the dog.
22              AGENT MERRIMAN:  We're not there yet.
23              MR. RILEY:  No.  It's coming.
24              AGENT HART:  So, thanks for (indiscernible) on
25   your cleaning day.  I wanted to talk to you about Jacob
```

USA-003534

1   Hiles.

2            MR. RILEY:  Oh, yeah.  Yeah.

3            AGENT HART:  So, just want to get a little bit of

4   background on what your relationship is, and just kind of --

5   (indiscernible) --

6            MR. RILEY:  Other -- yeah.  Other than knowing

7   him -- knowing his name through the fishing community, I

8   really don't have any - you know, I've never fished with

9   him.  He's always kind of been an outside kind of guy.  You

10  know what I mean?  He was kind of -- like, in the fishing

11  community.  So, a couple years ago in the White Marlin Open,

12  he caught a winning white Marlin, but he gaffed it.  So, the

13  way it works is, according to the rules -- and pretty much

14  everybody gaffs a fish.  If you gaff the fish, then it goes

15  by time.  And so, if I gaff the fish first and then you gaff

16  the fish and they were the same weight, then I would get the

17  winning money.  But if you caught a fish later in the

18  tournament that was the same weight and you didn't use a

19  gaff, you hand -- you leadered it by hand, you trump my gaff

20  shot.  So --

21           AGENT MERRIMAN:  I don't know what "to gaff"

22  means.  I'm not a fishing man.

23           MR. RILEY:  You use a hook.

24           AGENT HART:  (Indiscernible).

25           AGENT MERRIMAN:  Got it.  Okay.

```
 1              MR. RILEY:  So, long story short, he got -- it was
 2    the first time in history there was two fish that tied.  Or
 3    at least, you know, since I've been fishing it.  And he made
 4    a big deal because his fish was gaffed, and he got bumped.
 5    And you know it was like a million dollars.  So, that's kind
 6    of how I, you know, became acquainted with him, because he
 7    made such a big deal about, you know, the gaff shot.
 8                              EXAMINATION
 9              BY AGENT HART:
10         Q.   Okay.  And he's down in Virginia Beach?
11         A.   Yes.
12         Q.   Okay.  What -- you guys are friends on Facebook?
13         A.   Yes.
14         Q.   How did that come about?  Kind of walk me through
15    the initiation of that.
16         A.   Again, in the fishing community, like, if you were
17    to see my Facebook friends, they're either law enforcement,
18    fraternity brothers, or fishing guys -- people in the
19    fishing community.
20         Q.   Okay.  Okay.  When did you start communicating
21    with him?
22         A.   Shortly after the 6th, I think.
23         Q.   Okay.  What was the nature of those
24    communications?
25         A.   Just -- you know, I kind of reached out to him to
```

1    say, you know, listen.  He was posting stuff on Facebook,

2    like videos on Facebook.

3        Q.    Videos of --

4        A.    The only videos I originally saw were him standing

5    outside the building, you know, basically with the crowd.

6    And then he posted -- actually, someone else tagged me that

7    he said that he had gotten inside the building.  Basically,

8    that was the extent of it.  And I told him, I said, dude,

9    it's probably not a good idea to be posting stuff on

10   Facebook.  You know if -- and I don't, I don't remember.

11   I'm totally paraphrasing here because I don't remember

12   exactly what I said, but it was basically to the extent, to

13   the extent of probably not a good idea to be posting stuff

14   on Facebook.

15       Q.    Okay.  Could you have told him to take stuff down

16   or to get rid of things?

17       A.    I don't remember.  I might have told him, you

18   know, hey -- you know, again, in the same connotation, it's

19   probably not a good idea to be posting stuff on Facebook.

20       Q.    Okay.  What were you hoping to accomplish by

21   telling him that?

22       A.    Again, just, you know, probably not a good idea to

23   be posting stuff on Facebook.  You know.  Later I found out

24   that -- again, through another buddy in the fishing

25   community, that -- because that -- again, the gist of his

1  original post, or at least what I got out of it, was he got

2  wrapped up in the crowd, ended up in the building.  I've

3  heard that from a lot of people since.  You know, we've had

4  a lot of people come up to the Capitol afterwards and, you

5  know, literally come up to us and apologize.  I had a guy

6  from the military come up, I don't know, a month or so ago,

7  and he's like, listen, man.  I got, I got wrapped up in the

8  melee.  You know.  My whole take of that day --

9            MR. RILEY:  -- dude, come on.  Hey, Beth?

10            BETH:  Yeah.

11            MR. RILEY:  Can you call the dog?

12            BETH:  I'm sorry, (indiscernible).  Come on.

13            MR. RILEY:  My whole take from that day was there

14  were several thousand people that were there to fucking

15  cause some serious shit.  You know, they were dressed in --

16  they had earpieces.  They had the armor.  They had the

17  helmets.  Bad dudes.  And then there were a lot of people

18  who just got caught up in that mob mentality and ended up in

19  the building.  And you know, initially, early on I even

20  said -- I said, I hope they charge everybody federally, you

21  know, because typically, in the years that I've worked up

22  there -- 27 years -- we charge people with bullshit DC code

23  every time.  And, you know, I was glad to see that we're

24  doing that this time.  We're charging people federally to

25  get the point across.  So, you know, as far as Jacob Hiles

1   goes, originally, that's what I kind of understood, is that

2   he got wrapped up in the crowd and ended up in the building.

3   And then another guy who is a friend of ours down at

4   Virginia Beach -- I've been friends with him for a long

5   time.  He's not, you know, he's not an exterior acquaintance

6   like Jacob Hiles, just somebody I know on Facebook.  I

7   actually Facebook with him and stuff.

8               BY AGENT HART:

9        Q.   Who's that?

10       A.   Ben Shepherd (ph.).  He sends me basically a video

11  of him in the building --

12       Q.   Of Jacob?

13       A.   Jacob Hiles in the building acting like an

14  asshole, smoking what appeared to be marijuana, and

15  basically it kind of went against his whole story of, I got

16  wrapped up in the -- with the -- you know.  I went here with

17  a fucking mission.  And I reached back out to him, basically

18  told him don't ever contact me again.  Don't want to talk to

19  you again.  I don't, I don't remember exact -- again, I'm

20  totally paraphrasing here.  You know.  You're no different

21  than the other motherfuckers that came up there to cause

22  problems.  So, that's the extent of my relationship with

23  Jacob Hiles.

24       Q.   Did you only communicate via Facebook or what

25  other ways did you and Jacob talk?

1      A.   I'm not sure if we text messaged or not, but I

2  know it was mostly via Facebook.

3      Q.   Okay.  Phone calls?

4      A.   I might have talked to him on the phone.  I

5  don't -- again, I don't remember.  I'm not trying to --

6      Q.   No, no, no, no, no -- yeah --

7      A.   Yeah.

8      Q.   -- it's, you know, we've got a number of Capitol

9  cases we're each in and both --

10     A.   Right.

11     Q.   -- (indiscernible) on the 6th as well, so I

12  understand.  You know, details at times can be fuzzy, and --

13     A.   Well, especially with someone who you've only

14  talked to a few times.  You know what I mean?

15           AGENT MERRIMAN:  Sure.  Yeah.

16           BY AGENT HART:

17     Q.   Yeah.

18     A.   Yeah.

19     Q.   Do you recall when it was you became Facebook

20  friends with him?

21     A.   I don't.  I think I've been Facebook friends with

22  him for a while.  But again, I never really communicated

23  with him much.  I might have reached out to him one time

24  about a fishing trip or something.  And it was, it was

25  actually funny.  It was someone else that sent me,

11

1   basically, his link from that day, you know, saying, hey,

2   look.  This guy was in the Capitol building, and you know,

3   blah blah blah blah, so --

4       Q.   Okay.  What made you reach out to him, though?

5       A.   Again, just from, you know, one fishing person to

6   another.  I knew that he had a daughter.  Initially, I was

7   like, you know, again, it's just not -- it's not a good idea

8   to be posting stuff on Facebook.  I don't know where this is

9   gonna go.  You know, again, I was hoping that it was gonna

10  go where it went, but it's probably not a good idea to be

11  posting stuff on Facebook.

12      Q.   Okay.  Okay.  Kind of the context of the overall

13  conversations -- what -- did you advise him, guide him,

14  provide any advice to him in regards to how to handle things

15  or whatever -- dealing with law enforcement or anything he

16  may have incriminating?

17      A.   I don't remember any specifics like, you know, you

18  know -- again, no more so than I give people that get locked

19  up for a DUI or something like that.  If I did give him, you

20  know, any advice.

21      Q.   Okay.  Okay.  So that was (indiscernible) --

22      A.   No.

23      Q.   -- specific?  Okay.  Have you, have you reached

24  out to other people that you were aware that were there and

25  among those other guys --

USA-003541

1        A.    No.  He's -- no.  He's the only one I know that

2    was there.

3        Q.    Yeah.  Okay.  I want to show you a few things and

4    kind of want to -- want your help in figuring these out.

5    So, we've obviously talked with Jacob.  And he's been

6    charged, as you know.  So, you --

7        A.    What has he been charged with?

8        Q.    A handful of different things, primarily, kind of

9    the basic charges that people are looking at with regards to

10   being in the Capitol when they shouldn't be.  Nothing along

11   the lines of assaulting officers or anything like that,

12   'cause (indiscernible) what he was involved in.  But this

13   was the first message you sent to him on the 7th.

14       A.    Okay.

15       Q.    You (indiscernible) --

16       A.    Yes, I -- I mean, obviously, if it's there, that's

17   what I sent him.

18       Q.    Yeah.  Okay.  And that's what I'm -- I -- you

19   know, we kind of want to get to the crux of what were you

20   looking to accomplish by reaching out to him like that?

21       A.    Well, I -- again, basically, you know, whatever it

22   says there, but -- is there any criminal charges here, or --

23   I mean, for me?

24       Q.    For Jacob?  Well, we are conducting a criminal

25   investigation and one of the things that we're concerned

1  about is this.  You haven't been charged with anything.  We

2  want to determine what the intent was behind reaching out to

3  Jacob.

4       A.   Like I said before, I was just looking out for him

5  from one fishing person to another.  I knew he had a

6  daughter, you know, and I was just -- you know.  I -- that

7  was basically the extent of it.

8       Q.   Okay.  And you can probably figure out why we want

9  to talk to you, given, as you state here, Jake, I'm a

10 Capitol police officer.  I agreed with your political

11 stance.  And then you're offering him advice about --

12      A.   I -- listen.  I understand what that looks like.

13      Q.   Yeah.

14      A.   I'm a conservative.  I'm a Republican.  That's the

15 extent of it.  There's nobody more outspoken about what

16 happened that day.  I watched somebody almost die in my

17 arms, you know, a fellow police officer.  As far as, like --

18 I don't know where you're getting that with the way I wrote

19 that, but my dedication to the job is foremost.

20      Q.   There's no one here doubting your allegiance to --

21      A.   Yeah.  I mean, as a matter of fact --

22      Q.   -- being a police officer or (indiscernible).

23      A.   Right.  So, I don't think my political -- as a

24 Capitol police officer, there's plenty of us that are

25 Republicans and Democrats.

1    Q.   Just like, just like everyone else.

2    A.   And over the years, I've had plenty of friends,

3    members of Congress, who were Republicans and Democrats.  I

4    knew, from some of the stuff that Jake's posted, that he's a

5    conservative.  Again, I also didn't realize the extent of

6    his shenanigans that day.  And, as that became more clear to

7    me, I broke off any relationship that I had with that guy.

8    Q.   And we've seen that.  We've seen that.  So --

9    A.   Okay.  So --

10   Q.   -- and everything that you're saying would -- you

11   know, we can go through and see.  So, what you're saying

12   is --

13   A.   So, again, early on -- and I don't even remember

14   her name, the person that reached out to me was another

15   person in the fishing community who basically said, hey,

16   listen, Jake was in the building that day, blah, blah, blah.

17   You know, he's got a daughter, (indiscernible).  That was

18   the extent of my reaching out to him.  As far as political

19   stance, it goes no further than the fact that we're both

20   conservatives.  I'll be the first person to tell you that

21   being a Republican and what those assholes did, that's no

22   correlation.  You know what I mean?

23        AGENT MERRIMAN:  Absolutely.

24        MR. RILEY:  So, again.  Don't read too much into

25   that.  My dedication is to the job --

1          BY AGENT HART:

2          Q.    Absolutely.

3          A.    -- and it's reflected in the 27 years of service

4    that I've had there.  I'm sure if you guys have looked up

5    any information on me, you can see that I'm a pretty -- as

6    far as Capitol police goes, I'm a pretty decorated officer.

7    All right?  So, please don't read into that.

8          Q.    Which is why we didn't want to read into it, and

9    we wanted to come and ask you.

10         A.    Yeah, well, I'm telling you.  Right?  My

11   dedication is to the job, and it doesn't matter if it's a

12   Republican or Democrat standing behind me.  I stand the

13   line.  You know what I mean?

14         Q.    Yeah.  And then just, you know, past that, you

15   know, take down the part about being in the building, 'cause

16   they're currently investigating everyone who was in the

17   building.  Kind of giving him a head's up.

18         A.    Yes.  Again -- I wasn't even sure --

19         Q.    So, that's outside the political -- like, even if

20   you said, hey, I'm (indiscernible) --

21         A.    So, just so you know -- what's the date on that?

22         Q.    The --

23         A.    The 8th?

24         Q.    -- 7th.

25         A.    The 7th.

1     Q.   So, the next day.

2     A.   I didn't even know they were currently

3  investigating everybody in the building.  That was my

4  attempt to get him to take the shit down.  Right?  So, the

5  day after, I had no idea that they were even doing that.  My

6  attempt was, again, worried about him getting pinched with

7  his daughter.  And also at the time, thinking that it was

8  just him being an idiot, 'cause his initial video was him

9  standing outside the building.  That's the one I saw.  I

10  don't even know if I put in there later that -- if -- yeah,

11  I think I did.  I think he did also put in there that he

12  went inside the building.  Is that correct?

13     Q.   Mm-hmm.

14     A.   I don't remember.  So, that --

15     Q.   He said he got pushed inside when everybody --

16     A.   That's what it was.  I got pushed inside.

17          AGENT MERRIMAN:  Sure.

18          MR. RILEY:  Yeah.  So, again, that's where I was

19  going with that.  At that point in time, I didn't even know

20  that they were doing an investigation.  I kind of figured

21  that's where it was gonna go.  You know, and even at that

22  point in time, it's pretty freaking amazing what they've

23  been able to do as far as this investigation, because there

24  was a lot of freaking people in the building.  And granted,

25  there's a lot of cameras in the building, but still, it's

17

1   been nothing short of amazing, you know, the way people have

2   been identified.

3            AGENT HART:  Well, we've looked at texts --

4            MR. RILEY:  Yeah.  Yeah.

5            AGENT HART:  -- since that day of going through --

6            AGENT MERRIMAN:  Plenty of video.

7            BY AGENT HART:

8       Q.   Hours and hours, endlessly, of videos, and the

9   worst *Where's Waldo* books ever.

10      A.   Right.

11      Q.   Because you see somebody, and you try to find them

12  in another --

13      A.   And the other, the other thing -- I'm not sure.

14  Again, I don't even remember the gist of this conversation.

15  As a matter of fact, again, once I found out who he really

16  kind of was, I deleted my contacts with him.  But through

17  our conversation, I -- it also appeared that he was a little

18  more off the rocker than I originally thought, 'cause the

19  only other comment where we've seen any information on him

20  was on a YouTube video, fishing with another guy that I

21  watch all the time, which is a guy named Deer Meat for

22  Dinner (ph.).  And he seemed like a normal guy there.  You

23  know what I mean?

24      Q.   Yeah.

25      A.   And again, that's -- that was kind of my only, you

USA-003547

1    know -- in that, he's talking about his daughter and this

2    and that.  So, that's kind of -- yeah.

3        Q.   Kind of pulled at your strings a little bit and --

4        A.   Yeah.

5        Q.   -- kind of made you, well -- I was gonna say feel

6    sorry for him, but kind of --

7        A.   No, it did make me -- but again, that was all

8    based on I got pushed in the building, dah, dah, dah, dah.

9    You know, and then I seen these other videos weeks later of

10   him in the building basically being no different than the

11   rest of the assholes and I'm like, go fuck yourself,

12   essentially.

13       Q.   So, we also have some phone records of his and

14   there was a -- I'll have to find the date -- there was a

15   call between the two of you that was 23 minutes long.

16       A.   Mm-hmm.

17       Q.   What do you recall was discussed during that

18   conversation?

19       A.   I honestly don't even remember the conversation.

20   Was it after a text message?  Because that might --

21          BY AGENT MERRIMAN:

22       Q.   It was after a message on Facebook, where --

23       A.   Yeah.  Right.  What --

24       Q.   -- he mentions that he's been charged.

25       A.   Oh, okay.

USA-003548

1      Q.   And then, and then you say, give -- call me.

2      A.   Okay.  I --

3      Q.   And you did, and you guys spoke for 23 minutes.

4      A.   I -- it was probably me just telling him be

5  truthful.  You know?  That's -- you know, anytime I've had a

6  buddy who's been arrested, I always tell him, just -- the

7  most important thing is be truthful.

8      Q.   Do you remember him describing the charges to you?

9  Do you remember him talking about the 6th?

10     A.   I honestly don't remember the conversation,

11  truthfully.  I mean, I just don't remember the conversation.

12          BY AGENT HART:

13     Q.   Okay.  How many calls would you say you had with

14  him?  Do you -- and I'm not looking for -- maybe it was four

15  calls, (indiscernible) --

16     A.   I -- again, I have no clue.  Yeah.

17     Q.   Half a dozen, dozen ballpark?  And it's -- we're

18  just trying to get -- well, we're trying to get an idea of

19  your recollection of the events and if those match with what

20  he's told us.  (Indiscernible) --

21     A.   So, what I'm telling you right now is, whatever

22  the conversations were about, they weren't, like, they

23  didn't -- they don't jump out at me as something that I

24  remember.  And I honestly, again, I don't even remember how

25  many phone calls I had with him.  I'm sure it's in there.

1   You could probably look it up.  I know it was probably a

2   couple of phone calls, but other than that, I wouldn't -- I

3   mean, I'm being totally honest here, I don't remember how

4   many phone calls I had with the guy.

5        Q.   Okay.  Any face-to-face meetings?

6        A.   No.  Never.  None.

7        Q.   Have you planned on meeting him?

8        A.   No.  I planned on, at some point, fishing with the

9   guy.  You know what I mean?  I'd like -- I -- he's

10  supposedly a hell of a fisherman, but other than that, no.

11       Q.   Okay.  Do you have your cell phone handy real

12  quick?

13       A.   It's charging out in the garage.

14       Q.   Okay.

15            (Mr. Riley leaves the room.)

16            (Background noise.)

17            (Mr. Riley enters the room.)

18            BY AGENT HART:

19       Q.   I really appreciate that you're accommodating when

20  we show up at your house on one of your days off.

21       A.   Oh, no problem.

22       Q.   You remember the last time you chatted with Jacob,

23  or when that was (indiscernible)?

24       A.   I don't.  See, if I reached out to him January, I

25  would say it was a good four to six weeks afterwards, maybe.

1      Q.   Okay.  And that's when -- is that when you had the

2  Facebook message of, (indiscernible) I saw what you actually

3  did?

4      A.   Yeah.

5      Q.   I can (indiscernible)?  Okay.  Any time after that

6  there's a call or he tried to reach out to you?

7      A.   Not that I remember.  I know I haven't talked to

8  him.  Again, you know, I don't, I don't, I don't think so.

9  Did you want to see messages, or --

10     Q.   Yeah, so, just to let you know, we actually have a

11 warrant --

12     A.   Okay.

13     Q.   -- for your phone.  What we're gonna do is take

14 away this, image it, and give it back to you.

15     A.   Okay.

16     Q.   So, we're going to take a look at this today.  Can

17 you put it in airplane mode for us?  Okay.  What's the code

18 to get in your phone?

19     A.   I use my eyes.  Oh, actually, no, no.  There's

20 another way.  Hold on.  So, if you have the -- it's the

21 dock, so let me show you.

22     Q.   Oh, okay.  You wanna -- draw it?

23     A.   Yeah.

24     Q.   Draw it on the back of that.

25     A.   I think that's it.  Right?  Is that it?

1     Q.   Is it 9 or 12?

2     A.   Hold on.  It's the (indiscernible) -- it is -- did

3   you see that?

4     A.   Yep.  So, start here?

5          AGENT MERRIMAN:  Start here?

6          MR. RILEY:  Yeah.

7          AGENT MERRIMAN:  Okay.

8          BY AGENT HART:

9     Q.   Okay.  Perfect.  Excellent.  Thank you very much.

10    A.   Yeah.

11    Q.   I will fill out a receipt for you.  Caspian Drive?

12    Q.   Yes, sir.

13    A.   Grasonville.  Correct?

14    Q.   Mm-hmm.  You're working tomorrow.  Correct?

15    A.   Yes, sir.

16    Q.   Okay.  If we can get this done tonight, what we

17  can do is I can meet you halfway.  If you're gonna be at the

18  Capitol.

19    A.   Just tell me.  Yeah.  That's fine.

20    Q.   We'll swing by.  And this is a -- is that an S9,

21  or a --

22    A.   I have no idea.  It's old.  S7, maybe?

23    Q.   S7?  Okay.  Just trying to get into your settings,

24  and I couldn't find your number.  I (indiscernible) know

25  what I'm doing.  I'm just looking up --

USA-003552

23

1          A.   That's fine.

2          Q.   Oh, it is an S7.  And if you have questions about

3    that, please ask.

4               (Silence.)

5               MR. RILEY:  So, am I in any kind of trouble?

6    What's the scope of the investigation (indiscernible)?

7               AGENT MERRIMAN:  Well, I mean, we showed you that

8    Facebook conversation, and that's obviously --

9               MR. RILEY:  So, you're worried about, like the

10   political --

11              AGENT HART:  Nope.

12              AGENT MERRIMAN:  No.

13              MR. RILEY:  -- like, from a political

14   (indiscernible) --

15              BY AGENT HART:

16         Q.   No, no, no.  Not from a political aspect.  I think

17   the concern is that being a Capitol police officer, reaching

18   out to somebody who was in the Capitol during the event that

19   was subsequently charged, and then your initial

20   communication is specifically telling him to get rid of --

21         A.   Evidence?

22         Q.   Yeah.

23         A.   I understand.  Well, like I said, at the time,

24   like -- you guys saw everything, so, you know, it's -- I

25   hope that that doesn't get me in a pickle because --

1     Q.   Well, that's one of the reasons we wanted to come

2  out and talk to you.

3     A.   Yeah.  Well, again --

4     Q.   We didn't, we didn't want to do it at work.  We

5  didn't want to make a big thing of it there.  We hate coming

6  to somebody's house to do it, 'cause (indiscernible) --

7     A.   No, no.  I get it and I appreciate that.  Are you

8  guys the ones handling this investigation?

9     Q.   Yeah.

10           AGENT MERRIMAN:  We are.

11           MR. RILEY:  The only thing that I would ask is

12  that, you know, to be fair and understand my mindset.  You

13  know, initially reaching out to him was not to try and skew

14  any kind of investigation or anything like that.  And again,

15  even though I didn't know that it was gonna be a big

16  investigation at the time, I had a pretty -- you know, I was

17  hopeful that it was going to be.

18           AGENT MERRIMAN:  Right.

19           MR. RILEY:  But my dedication to the job has

20  always been -- I got 27 years on --

21           AGENT MERRIMAN:  No question there.  Yeah.

22           MR. RILEY:  One of the only police officers in

23  this whole area that was National Police Officer of the

24  Month.

25           AGENT HART:  2011, right?

 1          MR. RILEY:  Yeah.  You know, it's been a rough 27

 2   years.  Right?

 3          AGENT MERRIMAN:  Mm-hmm.

 4          MR. RILEY:  I've had my partner commit suicide.

 5          AGENT MERRIMAN:  Mm-hmm.

 6          MR. RILEY:  I watched Billy take his last breath a

 7   couple months ago.  I was on scene for that.  So, my

 8   dedication's to the job.

 9          AGENT HART:  Yeah.  And to Brandon's point, no one

10   is denying that.  And that's why --

11          MR. RILEY:  (Indiscernible) sign here?

12          AGENT HART:  Yeah, just sign there.  And that's

13   why we wanted to kind of give you the courtesy of coming out

14   here and talking to you kind of cop-to-cop.

15          MR. RILEY:  Right.  If there was any charges, what

16   would they be?

17          AGENT HART:  Don't know.  Given what we're looking

18   at, what we just discussed, if it's potential evidence

19   destruction, then we could look at obstruction.  But as you

20   know, our job is to collect information, which is why we

21   wanted to talk with you to.  It's not our decision about

22   what charges, if any, are made.  But that's, kind of, what

23   I'm started on.

24          MR. RILEY:  So, the next question is, do I need

25   an -- should I be getting an attorney?

```
 1              AGENT HART:  We can't give legal advice.

 2              MR. RILEY:  I know you can't.

 3              AGENT HART:  But I --

 4              MR. RILEY:  I'm usually sitting (indiscernible).

 5              AGENT MERRIMAN:  Yeah.

 6              AGENT HART:  But I -- if you're asking, I think

 7   you probably know the answer, even if it's just for peace of

 8   mind.

 9              MR. RILEY:  Got you.

10              AGENT HART:  And the AUSA's name is not on there,

11   I don't believe.  But what we'll do is, I'll leave, I'll

12   leave my card with you, if I have any.  And if you have

13   questions, call me.  I can get you in touch with the AUSA

14   who's assigned to it, and we can go from there.

15              MR. RILEY:  What's your name?

16              AGENT MERRIMAN:  Brandon Merriman.

17              MR. RILEY: What is it?

18              AGENT MERRIMAN:  Brandon.

19              MR. RILEY:  Marian (ph.)?

20              AGENT MERRIMAN:  Merriman.

21              MR. RILEY:  Merriman.

22              AGENT MERRIMAN:  Yes.  And Steve and I work

23   together.

24              MR. RILEY:  Got you.

25              AGENT HART:  And --
```

USA-003556

1            MR. RILEY:  You guys been partners for a while?

2            AGENT MERRIMAN:  Too long.

3            AGENT HART:  Yeah.  It -- our squad, our squad

4     focuses on, oddly enough, federal corruption

5     (indiscernible).  But after January 6th, everything --

6     everyone's been, kind of --

7            AGENT MERRIMAN:  Doing this stuff.

8            AGENT HART:  Yeah.  Doing these things.

9            AGENT MERRIMAN:  Yeah.

10           AGENT HART:  And we were given this one.  So,

11    that's where we are.  We work together on other, different

12    things, but we focus on other areas, primarily.  So, if you

13    have questions, if you have concerns, call me.  I'll get you

14    the AUSA's name.

15           MR. RILEY:  Okay.

16           AGENT HART:  No decisions have been made with

17    regards to anything yet.  Talking to you is paramount, which

18    is why we wanted (indiscernible) --

19           MR. RILEY:  Based on -- so, not knowing the, you

20    know, what the federal -- the USC code is for obstruction --

21           AGENT HART:  Yeah.

22           MR. RILEY:  -- based on that text, is -- does that

23    meet the legal ramifications of obstruction?

24           BY AGENT MERRIMAN:

25        Q.  Well, you know, that's -- a couple minutes ago,

28

1   you said it wasn't your intention -- that message wasn't

2   your intention.  So, what was your intention with sending

3   him that message?

4        A.   Again, like I said, it was basically to -- as

5   someone worried about -- again, not knowing at the time who

6   he really was --

7        Q.   Right.

8        A.   -- or what he really did, was to basically just

9   say, hey, it's probably not a good idea to be putting shit

10  on Facebook.

11       Q.   Yeah.

12       A.   And, again, once a, once an investigation is

13  started, I don't know what the, I don't know what the legal

14  line is for obstruction.  You know, is telling someone to

15  remove a Facebook post obstruction?  I don't know.

16       Q.   You know, it -- that jumped out to us when we saw

17  that.  It's, you know --

18       A.   To me, it -- like, obstruction always was, like --

19  but again, in today's world, I guess Facebook posts could be

20  considered evidence.  So --

21            AGENT HART:  And I think it's, given your status

22  as a Capitol police officer, that is what the concern was.

23            MR. RILEY:  Troublesome.  Yeah.

24            AGENT HART:  Yeah.

25            AGENT MERRIMAN:  Mm-hmm.

USA-003558

1            AGENT HART:  You know, if it was -- if you were

2     the gardener and you were like, hey dude, you gotta get rid

3     of that, yeah, that's probably still gonna look at it, but

4     it just -- I imagine they would look at it and say, hey,

5     there's somebody who's been in law enforcement 27 years.

6            MR. RILEY:  Wasn't smart.  I can -- yeah.  And I

7     can understand where the concern is there.  But again,

8     there's nothing to read into that.  I mean, the -- and

9     again, I think the only reason I put that in there was

10    because I wanted him to understand that I wasn't just

11    somebody, you know, telling him to take something down.  I

12    wanted him to know that, hey, it's my opinion, as a police

13    officer, that it's probably not a good idea to be posting

14    that, which, again, I don't think is a problem.

15           AGENT HART:  Okay.

16           MR. RILEY:  Hindsight, it sounds like I put myself

17    in a pickle.

18           BY AGENT MERRIMAN:

19    Q.   Is there a reason why you didn't reach out to us?

20    Not us, but -- knowing that, you know, the FBI would be

21    squarely involved in this after the fact?

22    A.   Well, again, once he told me, once he told me he

23    was under investigation I didn't feel like there was a need.

24    I mean, now you're making me think that maybe I should have

25    reached out to you guys, too.

30

1      Q.    Yeah.

2      A.    But again, other than what was already readily

3  available in the videos, I don't know what, you know, what

4  kind of information I could have given you --

5      Q.    Sure.

6      A.    -- because he didn't come -- you know, there was

7  no I'm part of this group or I'm part of that group.

8      Q.    Right.

9      A.    I mean, from the sounds of it, again, this is what

10 I knew, is he was just a fucking Joe Schmoe who's a little

11 off his rocker and went -- now, I know, went to the building

12 that day.  It sounds like he went to the building that day

13 to cause problems, but I don't know how I could've added to

14 your investigation.

15         AGENT HART:  Even if it was just a -- like, a

16 complaint.  You know, we have -- we had a ton of online

17 complaints, which is how we started a lot of our

18 investigations.

19         MR. RILEY:  Yeah.  Maybe I should have reached

20 out.  Well, then, the other thing, too was -- so, I -- there

21 was a -- my department sent something out shortly after my

22 dialogue with --

23         AGENT HART:  Jake.

24         MR. RILEY:  -- Jake --

25         AGENT HART:  Yeah.

USA-003560

1          MR. RILEY:  -- that I was under investigation.

2   And I assumed that that was what it was about.

3          BY AGENT HART:

4     Q.   You thought it was about Jake?

5     A.   Yes.

6     Q.   Okay.

7     A.   And when it got dropped, and -- because it

8   happened -- the investigation started right after January

9   6th.

10    Q.   Okay.

11    A.   When it got dropped and it said it was unfounded,

12  I figured that's what it was about.

13    Q.   Okay.  Was that Internal Affairs, or --

14    A.   Yeah.  OPR.

15    Q.   OPR.  Okay.  Yeah.  (Indiscernible).  Since we

16  have your personal phone, and if this is ready tomorrow or

17  the next day, how do you want us to get a hold of you?  Do

18  you have a work cell phone?

19    A.   I do.

20    Q.   What is that?

21    A.   202 --

22    Q.   Okay.

23    A.   -- 631-4412.

24    Q.   Okay.

25    A.   Yeah.  So, that's what I've -- you know, I figured

1   that that was what that internal investigation was about,

2   was after -- again, after I reached out to this retard, I

3   realized that I probably shouldn't have.  You know, just not

4   thinking.  There was nothing more to it than that.

5           AGENT MERRIMAN:  Yeah.

6           MR. RILEY:  You know there's nobody more upset

7   about the 6th than me.

8           AGENT MERRIMAN:  Sure.  Where were you working

9   that day?

10          MR. RILEY:  I was actually flagged down for one of

11  the pipe bombs.  So -- and I was tied up with that for quite

12  some time.

13          AGENT MERRIMAN:  Because of, because of the dog?

14          MR. RILEY:  No.

15          AGENT MERRIMAN:  No?

16          MR. RILEY:  No, but what's interesting is -- I'm

17  sure you guys have seen the video, is that guy walking down

18  1st Street, in front of the RNC, that -- I think it was the

19  night before.  We typically -- I typically work my dog at

20  that Metro, there.  So, had he had come through there during

21  the daytime, we would have got -- I mean, that dog is

22  phenomenal.  But -- so, early on in the melee, I was tied up

23  with that, and that took a while to clear.

24          AGENT HART:  Yeah.

25          MR. RILEY:  And then, there were three of us that

1  were there -- three canines that were there, and the guys

2  were like, let's, you know, let's go to the Capitol.  And I

3  was like, well, what are we gonna do with our dogs?  There's

4  tear gas there.  There's pepper spray there.

5          AGENT HART:  And they're not crowd-control dogs,

6  so it's not --

7          MR. RILEY:  No.  No.  So, the official who was on

8  the scene gave us some traffic posts, but then I kept

9  hearing calls for help on the radio, and I'm an EMT.  So, at

10  one point, there was an officer who was -- it sounded like

11  he was in pretty rough shape.  And by the time I got there,

12  I could see that he was in rough shape.  Apparently, he had

13  been hit in the head.  He had sustained a head injury, and I

14  couldn't, I couldn't listen to it on the radio anymore.  So,

15  I left my traffic post.  I ran code through 3rd Street

16  tunnel on the north side.  He was in one of the Senate

17  subways, and I was able to run down and find him, and

18  there -- we were -- they were debating on what to do with

19  him, because they also said that -- he was unconscious when

20  I got there.  But prior to me getting there, one of the

21  other officers had said that he was complaining he had a

22  neck injury, as well.  And I said, well, I'm more concerned

23  about potential bleed on his brain.  I said we need to move

24  him.  We can take him to my car.  I'll run him to the

25  hospital.  And we got -- kind of got in an argument about

USA-003563

1   moving him, and I said, the neck injury -- we can try to

2   stabilize his neck, but I was trumping the head injury.

3   Long story short, finally, while we were in the middle of

4   arguing, D.C. Fire found us.

5            AGENT HART:  Yeah.

6            MR. RILEY:  Because that was the other thing.

7   They were having a hard time finding people.  So, that was

8   just one thing that day.  Then, obviously, you know, later

9   that night, we were at the Capitol, and then took -- I was

10  there when they took Sicknick out in an ambulance, and then

11  helped clear the building and the grounds afterwards.  But,

12  you know, there's nobody -- I'm sure as you see me and look

13  through my phone, you know -- and I -- actually, I just

14  recently had a discussion with this about another buddy of

15  mine who's a Homeland Security agent.  You know, he's a

16  Republican, too.  Some of my buddies have lost their

17  freaking minds.  You know, the shit that I'm hearing

18  about -- well, even -- I'm sure you'll see in there, I just

19  recently -- there's a, there's a text chain with a bunch of

20  my fraternity brothers, and -- like, (indiscernible) news

21  this week, which I wish he hadn't of, but to talk about

22  shooting Ashley Babbitt.  And their initial instincts

23  were -- and again, because that interview does not explain

24  the totality of the circumstances that day.

25            AGENT MERRIMAN:  Sure.

 1            MR. RILEY:  So, I went into a big dissertation

 2    about, you know, what he knew at the time, why his shooting

 3    is justified, and then one of my buddies even called me up,

 4    and he said, you know, it was nice that you explained that

 5    to me the way you did.

 6            AGENT MERRIMAN:  Mm-hmm.

 7            MR. RILEY:  So --

 8            AGENT HART:  Because too many people just see that

 9    one --

10            AGENT MERRIMAN:  Five-second clip.  Yeah.

11            AGENT HART:  -- of him standing in the doorway,

12    not knowing what's going on, what's on the other side.

13            MR. RILEY:  Well, and I'm telling you, that

14    interview didn't make it any better, because it doesn't

15    explain -- you know, I already watched something on one of

16    the YouTube channels the other day.  Some guy trying to take

17    that explanation and say why it's wrong.  You know?  No,

18    you -- first of all, you don't know who's in the room.

19    Right?  So --

20            AGENT HART:  And they're not gonna say who's in

21    the room, either.

22            MR. RILEY:  No.  So --

23            AGENT HART:  So, that leads conspiracy theorists

24    (indiscernible) there.

25            MR. RILEY:  Right.  So, I'm sure, as you know, we

36

1   have something called COG --

2              AGENT HART:  Mm-hmm.

3              MR. RILEY: -- and continuity of government is part

4   of the national security apparatus, and I heard those calls

5   for help on the radio, too.  Those guys in that room were

6   like, they're about to breach the door.  We need, you know,

7   support.  The fact that the officers outside, you know, left

8   the door, was because they couldn't hold it anymore.  And

9   that's another thing that fucking pisses me off.  I'm sorry.

10             AGENT MERRIMAN:  Don't apologize.

11             MR. RILEY:  I keep hearing all this shit about we

12  let them in the building.  That's a crock of shit.  The --

13  first of all, the videos that you see are after the fact.

14             AGENT HART:  Mm-hmm.

15             MR. RILEY:  They opened those doors up because we

16  had guys getting their asses kicked, and they had no way to

17  get back in the building.  We had people who are hurt, and

18  they had no way to get back in the building.  Bottom line,

19  the day is a total clusterfuck, but I can tell you, again,

20  it's been hard to live with.

21             AGENT HART:  Yeah.

22             MR. RILEY:  You know?  So, you know, my career in

23  the last handful of years -- I had a partner similar to you,

24  and I worked plainclothes with him.  I worked five years

25  with him, and he decided to take his own life.  And then --

USA-003566

1  so, I had that.  I had January 6th.  I had a whole bunch of

2  other shit.  I had a heart attack in December of 2019, which

3  is a direct result -- I didn't have high blood pressure.  I

4  didn't have high cholesterol.  I didn't have family history.

5  I never smoked a day in my life.  It's fucking stress.  You

6  know?  And then, this year, we've had January 6th.  I put

7  another buddy of mine on a helicopter who got hit on his

8  motorcycle, and I watched Billy take his last breath.  So,

9  you know --

10        AGENT HART:  It's been an emotionally devastating

11  year.

12        MR. RILEY:  Yeah, but what I'm saying is, is that

13  I would hate to see my career ruined over a fucking Facebook

14  message to some retard.

15        AGENT MERRIMAN:  And like Steve said, that's why

16  we're here.  We wanna, we wanna hear from you.  So, thanks

17  for talking to us.  We really do appreciate it.  I mean, you

18  can, you know, you can twist anything you read.  And until

19  you talk to the person that wrote it that's, you know --

20        MR. RILEY:  Yeah.  There was no maliciousness

21  behind it.  I wasn't looking to obstruct justice.  As a

22  matter of fact, again, once I, you know, once I found out

23  what this dude's about, I mean, I hope he fucking gets

24  whatever he deserves.  And I hope everybody in there gets --

25  it made my day to hear that we were gonna charge people

1    federally, because that's another thing that -- it's annoyed

2    me for a very long time, is the Capitol police officers.

3    That -- we're federal officers.  Right?

4              AGENT MERRIMAN:  Mm-hmm.

5              MR. RILEY:  And people come into our buildings,

6    you know -- this is the epitome of -- this is the worst of

7    the worst, but it's -- we have small-scale of this all the

8    time.  People come in the buildings, and they disturb the

9    peace or they commit acts of violence or they destruct

10   property.  Only charge them with D.C. code, write them a

11   ticket, (indiscernible).

12             AGENT MERRIMAN:  Mm-hmm.

13             MR. RILEY:  There's no deterrent to keep that from

14   happening.  You know, one could maybe even argue that that

15   is -- you know, kind of led up to this.  You know, for the

16   last, like, 15 years, we've just kind of let people -- oh,

17   they want the street?  Give them the street.  Oh, they spray

18   painted a statue?  Try to get a picture up.  You know?

19   Like, we've just not enforced the law.

20             AGENT HART:  Yeah.

21             MR. RILEY:  So, I was glad to hear that.  And, you

22   know, the last thing I would do is obstruct an investigation

23   of somebody who I thought deserved to be, you know -- get

24   the full justice that they deserved.

25             AGENT MERRIMAN:  Right.

1    MR. RILEY:  And I've -- I don't know how many

2  hundreds of people I've arrested.  You know, it's --

3  definitely wouldn't want to impede your investigation, is

4  what I'm saying.

5    AGENT MERRIMAN:  Yeah.  Okay.  Good.  Good.  Thank

6  you.

7    AGENT HART:  Yeah.  And we're, and we're taking

8  these extraordinarily serious.  I mean, half our cases are

9  assault on federal officers.  So, we -- what we are looking

10  at is guys who were fighting MPD, fighting you guys, going

11  into the Capitol fighting.  So, where we (indiscernible) --

12    MR. RILEY:  (Indiscernible) hurt that day.  You

13  know?  And that -- that's another thing, like, what's

14  sickening.  You know?  And again, it drives me insane that

15  they made it a political thing.  A lot of things in our

16  country right now -- you know, our jobs, what they've done

17  to the FBI and law enforcement.

18    AGENT HART:  Yeah.

19    MR. RILEY:  The whole -- the political thing right

20  now in our country is just -- it's just toxic.  But, you

21  know, early on with Brian's thing, they made it such a big

22  political deal.  Now, turns out that he died of natural

23  causes, and that -- and that's what people are saying now,

24  on the other side.  And I'm like, well, hold on a second.

25  He might have died of natural causes, but did he die of

 1     natural causes because he was involved in all the bullshit

 2     that day?  Absolutely.

 3               AGENT HART:  Yeah.

 4               MR. RILEY:  So, he didn't get hit in the head with

 5     a fire extinguisher, but he died because he was involved in

 6     that fucking riot.  So, it's the same.  Right?  And we're

 7     stuck in the middle.

 8               AGENT MERRIMAN:  Mm-hmm.

 9               MR. RILEY:  I don't know.  I'm -- again, back to

10     this shit.  I -- you know, all I can say is there was an

11     error in judgement to send him that, obviously.  It was the

12     day after, which I didn't even remember the day until you

13     showed me that.  It was the day after.  And I also had, you

14     know, emotions high that day from the day before.  So, it

15     was an error.

16               AGENT HART:  Well, we appreciate you sitting down

17     with us.  And again, sorry to show up at your house, but --

18               MR. RILEY:  No.  It is what it is.  You guys are

19     doing your job and, you know --

20               AGENT HART:  If you need anything, reach out to

21     me.

22               AGENT MERRIMAN:  Yeah.

23               AGENT HART:  I'll get the AUSA's name and number

24     for you if you want it.

25               MR. RILEY:  Is that AUSA in D.C.?

41

1            AGENT HART:  Yeah.  Yeah.  Should we get this

2   phone taken care of, we'll reach out to you on your cell.

3   Hopefully, it'll be tomorrow.

4            MR. RILEY:  Okay.

5            AGENT HART:  Sometimes the phones just --

6   depending on how much memory is in them -- take a while, but

7   I wouldn't imagine it being more than a couple days.  Then

8   we'll call and say, hey, we'll meet you somewhere in the

9   middle.  Here you go.  That way, we don't have to show up,

10  you know, on the Capitol and, you know, you have other guys

11  saying hey, who are those guys?  You know, and kind of take

12  it away so we can say, hey, just meet you on the side of the

13  road and there you go.  We'll do it that way.

14            MR. RILEY:  Got you.  So, to your knowledge, the

15  investigation that -- what my department was doing had

16  nothing to do with this?

17            AGENT HART:  I don't know that.

18            MR. RILEY:  Okay.

19            AGENT MERRIMAN:  We don't know what that was

20  about.  No.

21            MR. RILEY:  That's what I thought it was.  They

22  might have started it and turned it over to you guys.  I

23  don't know.

24            AGENT HART:  No.  Yeah, I don't know what that was

25  about.  Mike, we'll get out of your hair.  You got any

 1   extra -- other questions for us?

 2           MR. RILEY:  I guess the next question would be,

 3   how long before I hear something?

 4           AGENT HART:  That's a good question, to which I've

 5   got --

 6           MR. RILEY:  Zero answer?

 7           AGENT HART:  The typical Bureau answer.  Either it

 8   depends, or I don't know.  And I don't know.

 9           MR. RILEY:  In your experience -- how many years

10   have you been doing this?

11           AGENT HART:  Seventeen.

12           MR. RILEY:  Okay.  So, you've been around a while.

13   In your experience and in your -- and I know these type of

14   cases aren't your normal purview.  They're taxing you guys

15   with all this bullshit right now.  Do you feel as though

16   that this makes -- meets the criteria for that criminal

17   code?

18           AGENT HART:  You know, in my experience, I have

19   worked so many cases that I have thought met that level and

20   didn't, or the prosecutor said did not.  Other cases that I

21   worked I thought did not meet the level, the prosecutor said

22   it did.  That decision's up to them.  I thought, based upon

23   what I saw, there was enough interest to come and talk to

24   you.

25           MR. RILEY:  Got you.

1          AGENT HART:  I mean we don't make the charging

2    decisions.  We just provide the information.

3          MR. RILEY:  Got you.

4          AGENT HART:  I don't wanna give you a false sense

5    of hope or despair --

6          MR. RILEY:  No.  I appreciate that.

7          AGENT HART:  -- because I don't want to lead you

8    in the wrong way, and then, you know, six weeks later, a

9    hammer comes dropping down.  I don't, I don't wanna do that

10   to you.

11         MR. RILEY:  Right.

12         AGENT HART:  It's not fair.  I wish I had a better

13   answer, but I don't.

14         MR. RILEY:  Do you, either one of you, feel that

15   in any way I'm not being forthright or honest with you guys?

16         AGENT HART:  I think you've been as honest as we

17   can expect.

18         AGENT MERRIMAN:  Mm-hmm.

19         AGENT HART:  And if we didn't think you were, we'd

20   say, I don't think you're really being honest with us.

21         MR. RILEY:  No.  I --

22         AGENT HART:  Which is after, you know, we went

23   through some of the posts and you're like, yep, that's me,

24   (indiscernible) --

25         MR. RILEY:  Well, no.  Yeah, but also, like, when

44

1   you were asking questions early on and I didn't remember, I

2   didn't -- I wanted you to understand that I just honestly

3   didn't remember.  I was -- you know.

4            AGENT MERRIMAN:  Sure.

5            AGENT HART:  Which is why we ask follow-up

6   questions --

7            MR. RILEY:  Right.

8            AGENT HART:  -- and then we show you, you know,

9   kind of --

10            MR. RILEY:  No.  Because I hate that, because of

11   immediately you think I'm fucking trying to -- it's like --

12            AGENT HART:  I mean, let's be honest.  If you

13   asked me what I had for breakfast yesterday, I couldn't tell

14   you.

15            MR. RILEY:  Well, I'll tell you something.  Since

16   my heart attack --

17            AGENT HART:  (Indiscernible).  Yeah.

18            MR. RILEY:  -- they put me on a cholesterol

19   medicine, even though I didn't have high cholesterol, and

20   I'm like a 90-year-old guy with my memory, now.  It's one of

21   the side-effects of it.  So, all right.

22            AGENT HART:  Yeah.  Well, Mike, thank you very

23   much.  Please reach out, and as soon as this is done, I will

24   call you, and then we'll just meet you (indiscernible).

25            MR. RILEY:  Okay.  Let me just -- I'd like to just

USA-003574

1   write down what the potential charge is, so I have an idea.

2   So, I can do some research myself.

3              AGENT HART:  Yeah.

4              MR. RILEY:  What is it?

5              AGENT HART:  One of the ones that they were

6   considering was Title 18 USC § 371, which is a conspiracy

7   charge.

8              MR. RILEY:  371?

9              AGENT HART:  Mm-hmm.  Based upon communications

10  with the Hiles.

11             MR. RILEY:  Okay.

12             AGENT HART:  And the obstruction one, was it 1512

13  or 1505 --

14             AGENT MERRIMAN:  I'm bad when it comes to

15  statutes.  Yeah.  Just --

16             AGENT HART:  Yeah.  I think that's what it is, but

17  I could be wrong.

18             MR. RILEY:  All right, but it's obstruction?

19             AGENT HART:  Yeah.  And reading them, you can

20  (indiscernible) somebody.  Say, okay, here's what this

21  really means.

22             MR. RILEY:  No.  I know.

23             AGENT HART:  (Indiscernible) written in legalese

24  and, you know, the steps that have to be met for certain

25  charges are bigger on one, less on the other, and again, we

46

1  don't make the decisions.  We just -- we have the

2  unfortunate job of coming out and talking to you.

3           MR. RILEY:  All right.  All over a fucking

4  Facebook thing.

5           AGENT MERRIMAN:  Yeah.

6           AGENT HART:  (Indiscernible).

7           AGENT MERRIMAN:  Yeah.

8           MR. RILEY:  No shit.

9           AGENT HART:  Mike, thank you.

10          AGENT MERRIMAN:  Appreciate your time.  Thank you,

11 and please --

12          MR. RILEY:  Real quick -- hey, Beth?

13          BETH:  Yeah?

14          MR. RILEY:  Can you just come out here real quick?

15 You guys mind just hanging out with my wife for a second to

16 kind of explain to her what's going on?  Or no?

17          AGENT HART:  We'll let you do that.  Yeah.

18          AGENT MERRIMAN:  Yeah.

19          MR. RILEY:  Okay.

20          AGENT MERRIMAN:  If you don't mind.

21          MR. RILEY:  That's fine.  That's fine.  Yep.

22 (Indiscernible).

23          AGENT HART:  Okay.

24          AGENT MERRIMAN:  I apologize for intruding.  Thank

25 you.

FREE STATE REPORTING, INC.
Court Reporting  Transcription
D.C. Area 301-261-1902
Balt. & Annap. 410-974-0947

USA-003576

```
1              BETH:  Yeah.

2              MR. RILEY:  All right.  Thanks.

3              AGENT HART:  Yes, sir.  Appreciate it.

4              AGENT MERRIMAN:  Thank you.

5              MR. RILEY:  Appreciate it.

6              (Background noise.)

7              AGENT MERRIMAN:  This is Special Agent Brandon

8    Merriman and Special Agent Steve Hart.  The time is 12:06 on

9    August 31st, 2021.  We just concluded a surreptitiously

10   recorded interview, Mr. Michael Riley.

11             (End of recording.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```