## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 21-cr-628-ABJ |
| v. | : | **UNDER SEAL** |
| MICHAEL ANGELO RILEY, | : | |
| *Defendant*. | : | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Officer Michael Riley is a loving husband and a father to two amazing children. He has lived an exemplary life of public service and has literally saved lives by his actions. When others ran *from* danger, he ran *towards* it. When there were individuals suffering from catastrophic injuries or hurting emotionally, it was Officer Riley who rushed to their aid. In his years of service with the United States Capitol Police, Officer Riley responded to crimes of violence, officers down, individuals with medical episodes, explosive devices, and civil disturbances. He served in several specialized roles with the Capitol Police, trained fellow officers, and worked at major events, including numerous Inaugurations and States of the Union addresses, all while focused on protecting the members of Congress and the residents of Capitol Hill. As discussed in the over sixty letters submitted on his behalf, Officer Riley has spent the last twenty-five years doing as much good as he could, for as many as he could, for as long as he could. These individuals bear witness to Officer Riley's service, kindness, and generosity, not just as an officer, but as a person.

But the story of Officer Riley's life must unfortunately include this case, which, at its

greatest length, consists of a two-week period after January 6, 2021 when he communicated with fisherman Jacob Hiles, who was at the U.S. Capitol on January 6. As a result of his communications with Mr. Hiles, which began with a message to take down a portion of a publicly available Facebook Post and ended with a message informing Mr. Hiles that he wanted to have no further contact with him and was deleting all of the Facebook messages they had exchanged, Officer Riley was arrested, booked, and handcuffed in a holding cell. His service as a Capitol Police officer ended. He was prohibited from communicating with certain individuals who were his colleagues and had been his friends for years. His K-9 partner Toby, the sole reason that he returned to the Capitol Police after his heart attack in 2019, was taken from him. Moving forward, he is now a convicted felon, who, while previously a firearms instructor, will never be able to lawfully possess a firearm again. He must get permission before he can leave the State of Maryland. His public legacy is now that of someone without honor who purportedly "betrayed his oath," and, according to the Government, someone who "swor[e] to uphold the law," but "obstructed it." Officer Riley acknowledged his communications with Mr. Hiles to his fellow officers, to the FBI agents who spoke to him at his residence, and to the public during his trial, and, in all instances, he expressed regret for ever communicating with Mr. Hiles in the first place. If he could do it all over again, he never would have contacted him.

Separate and apart from the loss of his job and partner, his arrest, the claim that he betrayed his oath, and the great public shaming that he and his family have endured, Officer Riley has, with the loving support of his wife, faced even more challenges, to include a ███. Regardless of any sentence that he receives, these health challenges represent the next chapter of Officer Riley's

life, which puts into perspective the issues in this case. As a result of his recent diagnosis,

Officer Riley's ███████████████████████████████████████████

███████████████████████████████████████████, missing the date the verdict

was rendered in this case because of a continuously delayed ██████

      None of us wants to be judged by our worst act on our worst day. None of us want our

private texts or Facebook direct messages read to the world. Officer Riley is not a perfect man.

He has made mistakes and would be the first to admit them. He had a serious lapse in judgment

in speaking with Jacob Hiles, and while his conviction concerns the deletion of certain of his

own Facebook direct messages on January 20, 2021, his actions before those events, after, and

to the present day have been exemplary. He made a deeply regrettable mistake, but he is neither

a villain nor someone who should be incarcerated. He will be paying for his terrible lapse in

judgment for the rest of his life. While actually responding to reports of explosives at the U.S.

Capitol Complex and while checking for bombs *at the* U.S. Capitol on the evening of January

6, 2021, the historical record of this case, in print and electronic news, is that Officer Riley

"*colluded*" with a "January 6 rioter" and "*assist[ed]*" him. That is not this case and it never

was this case. But arguments and evidence, or lack thereof, about what Officer Riley knew,

and when he knew it, and what he intended, and what relevance or effect it had, if any, are no

longer before this Court. Rather, the sole issue now is how this Court should sentence Officer

Riley for his actions on January 20, 2021, *vis a vis*, his entire life before and after that day.

      Consistent with the statutory factors, the facts and circumstances in this case, Officer

Riley's significant medical issues, and the over sixty letters submitted on his behalf that

describe the person he is, what he means to others, and all the good that he has done, a sentence

of twelve months of probation, as recommended by United States Probation, is an appropriate

sentence in this case and serves the ends of justice.

## FACTUAL BACKGROUND

### Personal Life and Family History[1]

Michael Riley is 51 years old. Born in Coral Gables, Florida, Officer Riley moved to Alexandria, Virginia at the age of five, when his father, who served in the Air Force, was stationed at Bolling Air Force Base. *See* Presentence Report ("PSR"), ¶¶ 44-45 (D.E. 101). When Officer Riley was nine, his parents separated, and he and his brother relocated to Maryland with their mother. *Id*. ¶ 45. Officer Riley's mother remarried and had a daughter, Rachel Throckmorton, Officer Riley's sister, with whom he is extremely close and routinely visits in Florida. *Id*. ¶¶ 45-49. Officer Riley's father also remarried after reconnecting with a former neighbor, making Officer Riley's childhood babysitter, Cindy Stuart, his stepsister. Officer Riley's relationship with his parents, his stepparents, and his full family continues to this day and they, as his friends and colleagues, have submitted letters in his support.

Officer Riley lives on the Eastern Shore of Maryland with his wife Elizabeth ("Beth"), who he married in October 1999. *Id*. ¶¶ 51-53. Together, they have raised two amazing children, Madison (age 19), a college sophomore at Florida State University and Brandon (age 14), who lives at the family home. *Id.* Photographs of Officer Riley and his children are below:

---

[1] Accompanying this submission is an Appendix that contains certain medical records, exhibits, and character letters submitted on behalf of Officer Riley. Each page bears a bates stamp number beginning with the letter "**A**" and is referenced throughout this submission.





Beth Riley, who was present throughout her husband's trial, describes her husband as her "rock," a "fantastic father," and a "wonderful husband." PSR, ¶ 51. And, as discussed below, the events in this case and Officer Riley's present serious health complications have brought them even closer in their marriage. *Id.* Officer Riley's deep connection to his wife and children is memorialized in Beth Riley's letter to the Court:

**Beth Riley (A-30-31)**

Mike is the most incredible father to our two children . . . [h]e encourages them to be their best, to take life's challenges head on, to work hard and always believe in themselves. I couldn't have asked for a better father for my kids. I beg that you consider our family's sacrifices and Mike's devotion to the law and years of service when considering his sentence. Please allow him to put this chapter behind him so that he can focus on his health and can continue to be there for me and our children. I need him and my children need him.

The letters of support from some of Officer Riley's other family members further attest to what a wonderful person he is:

### Madison Riley (A-24-25)

As a young child, my dad would always praise me, telling me I was 'the best' . . . I was very young and had not yet experienced any degrading or humbling experiences in life yet. . . . [H]e would say [] "Life is going to knock her down. It is our job to build her up." And I'm very grateful that he did. . . . [W]henever I'm having a tough time, the one thing that calms me and makes me feel grounded is when he takes the time to reach out to me. When he sends me a silly gif that says 'I love you' or calls me to ask me how my day is, those are the moments that help motivate me to keep looking towards the future and pursuing my dream. He does this even with him battling his own ██████████ health issues, he makes the time and effort to check up on me any moment he gets. . . . The last thing our family needs is for him to be taken away from us.

### Rachel Throckmorton (A-32)

Mike is my big brother and I have looked up to him my entire life. . . . No matter what, he has always been there for me. This has carried over to his relationship with my husband, Josh, and my two children, Mason and Kaitlyn. My husband looks up to Mike as though he is his older brother. Mike is one of the first people Josh will call to ask for advice or to share a funny story. . . . He is the backbone of his family, and they all depend on him so much. . . . He is a true friend to many and has long lasting relationships with people from grade school, college, work, and the fishing and boating world. . . . Mike seems to know someone everywhere he goes and he takes pleasure in going out of his way to assist those he feels are in need.

### Nancy Hendershot (A-79)

I was charmed by his asking me and Beth's father for her hand in marriage prior to his proposal to her. . . . Mike is a friend maker, a nurturer, the kind of person who people want to be around. He's fun, capable, and knowledgeable in many areas. . . . He loves people . . .

### George and Laura Riley (A-98)

It is abundantly clear that Mike is a devoted husband and a very supportive father to his two children, always concerned for their happiness and wellbeing. . . . Mike's character, his integrity and his loyalty to our country are without question.. . . His family means the world to him and he means a lot to us.

### Cynthia Perini (A-102)

Mike is a good man. A good husband. A good father. A good son. A good cousin. A good employee. A good coworker. A good team player. Etc. It doesn't mean he is a perfect man but the history of his life's work speaks volumes about the positive impact he has had during his lifetime.

### Janice Engle (A-88)

Michael was also devoted to his grandfather (my father) who was a WWII veteran and acted as a caregiver during the final stages of his life at age 102. He is a loyal friend to many and has spent his life helping others with random acts of kindness. Michael will always be the first person to stop and help a stranger on the side of the road if they had a flat tire or their car broke down.

Officer Riley's compassionate actions as a person are not just limited to his family. Rather, his kindness extends to anyone who has had the good fortune to meet him during their life:

### Troy Raby (A-69)

[W]hen my son succumb to health issues and passed away at the age of 6 in December of 2007, Mike was the first college buddy to pick up the phone and call to check on me and express his condolences. This was an act of friendship that I will never forget.

### Jodi Pilkerton (A-86)

On his own volition, Mike professionally mentored my son, Jake, over the past ten years, enabling Jake to develop his interests and dreams[.]

### (A-53)

I am forever grateful to Mike. He helped me find the courage to seek help for my alcohol addiction. He was instrumental in helping me see the trend I was on and what was at stake.

### Nicole Carrion (A-35)

Seven years ago, my husband had a cardiac event. . . . Mike was outside in his yard and [] came running to help us. He stabilized my husband Jon until the paramedics arrived. There was the time that our dog had a seizure in the front yard while I was home alone and upon hearing the commotion, Mike

immediately ran over to the dog, picked him up and drove us to the veterinarian. Mike stayed with me at the vet's office until my husband arrived. Last November I lost my husband suddenly and unexpectedly and Mike and Beth have been a support system for my ten-year-old daughter and me. . . . The man you are sentencing is a good man. He is a family man, a dad, a good friend, and neighbor.

### Vincent Gerrior (A-71)

In 2019 my mother was diagnosed with Terminal Cancer and my family was devastated. Mike and his wife Beth would make homemade meals for my mother, swing over to check in on her and call me daily. In my 48 Years on this earth, I've built a strong friendship group, and none supported me and my family more during this difficult time.

### Officer Riley's Current Medical Condition

As set forth in the Presentence Report, Office Riley is in "poor physical health." PSR, ¶ 57. In December 2019, he had a ███████████████████████████████ ██████████████████████████████████, Officer Riley could not deal with the prospect of losing his assigned K-9 partner, Toby, especially after having lost his Capitol Police partner and friend Ryan Lee thirty months earlier. *Id.* ¶¶ 57, 65. Photographs of Toby, who lived with Officer Riley and his family, are below, and, as shown in surveillance video admitted by the defense at trial, it was Toby who was with Officer Riley when they were sent to detect explosives on January 6, 2021:



Officer Riley returned to work in January/February 2020. *Id.* ¶ 57. Unbeknownst to

him, the





### Education and Work Experience

The United States Capitol Police ("USCP") is composed of approximately 2,000 employees of which approximately 1,500 are officers. Most of the work of these officers is related to building security at the various components of the Capitol Complex and Congressional offices. **A**-26-29. As set forth in the various letters of coworkers, colleagues,



and supervisors, Officer Riley was assigned to several specialized units during his career with USCP and performed in a distinguished manner. He responded to critical incidents, handled civil disturbances, was trained and served in a unit designed to intercept individuals carrying explosives, served as a firearms instructor, and subsequently was selected to serve on the K-9 unit. *Id.* In his twenty-five years of service, Officer Riley participated in hundreds of major events and incidents to include Presidential Inaugurations, Fourth of July concerts, State of the Union addresses, head of state visits to the Capitol Complex, suspicious packages, hazardous materials, critical incidents, and civil disturbance events. *Id.* According to a former supervisor, on January 6, 2021, Officer Riley was the incident commander of one of the two pipe bombs recovered from the Capitol Complex area. *Id.* Beyond his skills as a police officer, Officer Riley was well liked and gave of himself to his position and to his fellow officers. *Id.*

### Officer Riley Saves Officer Bryan Nickelson's Life

On February 13, 2010, just after a massive snowstorm had slammed the District, Officer Riley, who had volunteered to work overtime, received a call on his radio of a fellow officer who had slipped and hit his head on the ice in front of the Postal Museum near Union Station. *See* https://nleomf.org/officer-of-the-month-february-2011/, last visited April 6, 2021; **A**-11, 12. While he initially suspected more of a slip and fall, or a broken ego over broken bones, Officer Riley switched on his sirens and responded to the call. *Id.* He found fellow officer Bryan Nickelson, whom he had seen alive and well less than an hour before, lying flat on his back, unconscious and bleeding from his head and nose. *Id.* That is the moment Officer Nickelson stopped breathing. As a certified emergency medical technician, Officer Riley tilted Nickelson's head back and dug his thumbs into his throat to force open his airway. *Id.* There was no response. He checked Nickelson's pulse. There wasn't one. Other officers responding

11

to the scene thought Nickelson was dead, but Officer Riley refused to stop administering CPR. *Id.* Twice Officer Riley's colleague gasped for air and then stopped breathing again before the D.C. Fire Department and EMS arrived and rushed him to the hospital. Officer Nickelson lay unconscious in the trauma unit at Washington Hospital Center for two weeks and underwent multiple surgeries. Doctors discovered he had a heart attack after slipping on the ice. *Id.*

In describing the incident, former Capitol Police Chief Phillip Morse stated: "Had Mike [Riley] not been there, we might not have had the outcome we all wanted." https://rollcall.com/2011/02/16/capitol-police-officer-earns-award-for-heroism/, last visited April 6, 2021. Officer Riley's then supervisor, Dan Turner, said, "Thank goodness he was working that day." *Id.*; *see* **A**-28 ("Officer Riley was undeterred and with resolve known by few continued beyond hope and literally brought Bryan back from death . . . without Officer Riley's commitment and resolve that Bryan's family would have lost their husband and father."). A video of Officer Riley describing the incident was posted by the National Law Enforcement Officers Memorial Fund after they awarded him the National Officer of the Month Award, which was in addition to the Capitol Police awarding him a Life Saving Medal. *See* https://www.youtube.com/watch?v=mHdXFDN3Rf4, last visited April 6, 2023.



## Officer Riley's Routine Acts of Service

Officer Riley's history as a Capitol Police officer is filled with stories of other selfless acts of kindness and dedication to the mission, which are too numerous to completely list here, but began early in his career and continued until his retirement. As documented in notes by colleagues, on July 8, 1997, Officer Riley "heard the frantic cries for help from the female victim of a robbery force and violence. Congressman Smith (MI) was also yelling for assistance for the victim." **A**-17-19. Officer Riley was able to chase down and apprehend one suspect and recover a stolen purse, incurring minor injuries in the process. In a typed victim impact statement, the victim stated, "[t]he first few days after the mugging were the hardest" and "[t]he Capitol Police took great care of me that night, showing understanding, compassion, and patience." **A**-18-19. Three weeks after that event, in response to an attempted traffic stop, "a driver speed[ed] up on to the curb blowing out several tires and continued on the curb to proceed down the sidewalk at a high rate of speed." **A**-17. Former Congressman Sonny Bono (CA) "was nearly struck by the out-of-control vehicle." *Id.* According to his colleague, Officer Riley's actions in stopping the vehicle brought a quick "conclusion to a life-threatening situation."[4] *Id.*

On November 29, 2019, Officer Riley responded to the Capitol Visitor Center South to assist an unresponsive female. As stated in his commendation, upon arrival, Officer Riley "without hesitation provided critical first aid services that included providing chest compressions and the use of an automated electric defibrillator." **A**-16. Officer Riley's "quick

---

[4] Earlier that year, Officer Riley also received a commendation for responding to the tragic death of an employee of the Architect of the Capitol working on a project near the Cannon House Office Building. **A**-15.

response, and outstanding cardiopulmonary resuscitation efforts brought great credit to the

Department[.]" *Id.*

As discussed in numerous letters from fellow law enforcement colleagues, Officer

Riley provided exceptional service to the Capitol Police in his twenty-five years of service:

> We were among the first to arrive at the Memorial Door and walked inside to a crowd of frightened and scared staffers, members of Congress, and visitors, while officer JJ. Chestnut laid there shot in the head from deranged lunatic Russell Weston, who was minutes earlier wounded in a shooting with Detective John Gibson[.] . . . Mike stayed on that crime scene for over 14 hours securing the area. Afterwards, I remember thinking that I wouldn't have wanted to have been partnered with anyone else that day. (**A**-22-23).

> One of the things I always appreciated about Mike was his desire to make everyone in our class a better officer. . . . I was always impressed by his professionalism and decency towards those he arrested. He had compassion and empathy for his arrestees and their situation. He tried to impart wisdom and advice to those that were heading down the wrong path in life. He was always fair. In some ways his strong desire to help others may have led him to his current situation. He has always placed others before himself and has tried to provide guidance to people who have made a mistake. (**A**-67).

> During our times working together, Mike has always been fair and unbiased in his style of policing. Mike treated suspects and/or prisoners with the respect due them to include respecting those whom disrespected him. He has saved lives of civilians as well as on many occasions assisted fellow officers in tough situations. Mike has helped citizens in a multitude of ways also that were not situations of arrest nor investigation. Many of those times were not even request for assistance, they were just Michael Riley being Mike Riley, a kind person, willing to help anyone, not seeking praise all while wearing a police uniform in his assignment. (**A**-62).

> We are responsible for protecting the building that is internationally recognized as a symbol of freedom and democracy. The weight on our shoulders is huge. Mike Riley had a long and diverse career with the United States Capitol Police something he put his whole heart (literally, suffering a heart attack) and life into. The decisions we must make are often instantaneous and for all the world to see. . . . I believe the tragic end to Mike's beloved career and public embarrassment is an additional astronomical weight to bear. (**A**-47).

> Mike was not only a good mentor, but he was a loyal friend that always gave more than he asked for as a friend. Mike was there for me when I needed him

during a few rough patches in my personal life. He gave me the advice that I needed to hear, the advice of a loyal husband and the advice of a strong father figure. This advice turned me into the husband and father that I am today. Because Mike has always been there for me as a friend and a coworker, I was able to overcome tough obstacles in my personal life and in my career to succeed. Mike did this for everyone that called him a friend, a colleague, a father, a husband, or family; he is a role model to many people in his life and he has done his part to make this world a better place. (**A**-39-40).

Numerous times Mike has saved lives from performing CPR, to guiding people to the resources they needed to either get them off the streets or prevent them from taking their own lives. (**A**-64).

The events of January 6th were extremely horrific for the law enforcement officers involved, including my wife. . . . I reached out to Mike who helped my family through this dark period. For that, I will be forever grateful to Mike. Michael Riley was not only a great police officer, he is a great person. He is always willing to help those in need. (**A**-38).

Mike was one of the best police officers I've ever had the privilege of working with. From taking criminals off the street, saving a fellow police officer's life, to being Officer of the Month and receiving multiple other awards and accolades, Mike has made a difference in people's lives on countless occasions. As a friend over the years, Mike has been there for me multiple times. Sometimes it was just small talk, other times I leaned on him to help navigate my own trying times that life sometimes deals us. (**A**-89).

It is not just my opinion; it is a demonstrable fact that Officer Riley was truly one of the most gifted and exemplary officers the USCP has ever had. . . . He came into work positive every day. He added levity to long days and bad situations. He volunteered to cover other officers' requirement[s] to work overtime or to work tougher assignments. [He] was also known for his dedication, honesty, compassion, reliability[.] (**A**-27-29).

## **Death of Partner Officer Ryan Lee**

Officer Riley was previously partnered with former Capitol Police Officer Ryan Lee.

**A**-20. They had a strong bond, not just as officers, but as friends. Their families spent "time

together, hosting each other, attending sporting events, and going for boating weekends and

beach trips." *Id.* When Officer Lee did not report home one evening and multiple phone calls

went unanswered, Officer Lee's wife turned to Officer Riley, as she stated in her letter to the

Court. *Id.* Officer Riley responded immediately and he and a few other officers went to look for Officer Lee. *Id.* Officer Lee was found, the victim of a self-inflicted gunshot wound, and it was Officer Riley who made notification to his wife. Separate and apart from that personal loss, Officer Riley looked after Officer Lee's wife in the weeks after Officer Lee's death:

> In May of 2017, I called Mike early on a Saturday morning to let him know my husband had been missing since the previous night and was not responding to calls. This had never happened before and I was hysterical and frightened. **Mike lived over an hour away, but he told me he would leave immediately and would call two fellow officers; he assured me they would find him**. By the time they arrived, I had notified our local authorities and a full search was undertaken. Unfortunately, they discovered my husband's body that morning -- he had taken his own life. The grief was unbearable. Mike, also grief-stricken, stayed by my side for that first week helping me with whatever I needed. **I will never forget the friendship he gave that week to me and my son. He continued to stay in touch with texts, phone calls, visits, and family get-togethers, where others slowly faded away. My son and I could not have survived that week without his support**.

**A**-20-21 (emphasis added).

Officer Lee's brother, Richard Carey Lee, shared the same sentiment: "[t]he commitment, love, support, and selfless devotion to the healing of my brother's family was both moving and immensely helpful for us. Mike is an honorable man . . . [h]e is a 'giver,' not a 'taker' in life." **A**-36. Officer Lee's wife's letter to the Court concludes by saying that her "husband was a good judge of character" who deeply cared for Officer Riley and to please remember her "words of support for this man of dedication, honor, love, and duty when you sentence him." **A**-21; *see* PSR, ¶ 65 (describing the effect of losing Ryan); **A**-25 (same).

### Officer Riley's Actions on January 6, 2021

As described at trial, on January 6, 2021, Officer Riley and his K-9 partner Toby responded to a report of an explosive device at the RNC headquarters:





Officer Riley made contact with a security guard at the location, obtained a photograph of the device, set up a command post, and advised the evacuation of the building as the

evacuation of the nearby Capitol Hill Club had already commenced. Officer Riley transferred the photograph to the USCP command structure and was subsequently shown on surveillance video briefing the bomb squad on the location of the device. Officer Riley identified the best avenues of approach for the bomb squad's robot. He then moved back to the location of the command center, which was pushed back from the original location. Officer Riley and Toby swept for explosives on the street near the command center and were eventually cleared to leave the location by supervisors. Later that afternoon, Officer Riley went to the Senate side of Capitol Hill after hearing on the radio that an officer was down. Officer Riley searched for an open entrance to the Hart Senate Building and followed the FBI SWAT team to get in. He reached the downed officer, who was suffering from head trauma, and did preliminary checks while waiting for D.C. Fire and EMS, who was having trouble reaching the officer. For his actions protecting the Capitol on January 6, 2021, Officer Riley received the Congressional Gold Medal. *See* PSR, ¶ 73 (17).

## **Death of Officer Billy Evans**

On April 2, 2021, Capitol Police Officer William "Billy" Evans was killed in the line of duty when a driver rammed his vehicle into the north barricade of the Capitol Complex, slamming into Evans and another officer before crashing into a barrier. **A**-28; *see* https://www.npr.org/2021/04/03/984107280/slain-u-s-capitol-police-officer-was-an-18-year-department-veteran-father-of-2, last visited April 6, 2023. Officer Evans suffered a catastrophic injury during the attack, and Officer Riley was one of the first officers to arrive on scene. Officer Riley placed Officer Evans in a vehicle. **A**-28. As discussed by a then Capitol Police Deputy Chief, "Officer Riley's quick actions and performance during one of the most overcoming scenes an officer can witness reflects his abilities and dedication to the mission of

the Department and protecting others." *Id.*

As discussed in the over sixty letters accompanying his sentencing memorandum, numerous former colleagues describe Officer Riley's selfless acts of kindness and professionalism in his years as a Capitol Police officer, which separates him apart from others, not just as an officer, but as a person.

## ARGUMENT

### I.    THE SENTENCING GUIDELINES, STATUTORY FACTORS, AND OTHER CONSIDERATIONS SUPPORT A NON-INCARCERATION SENTENCE.

Officer Riley faces sentencing on one count of obstruction of an official proceeding in violation of 18 U.S.C § 1512(c)(1), which does not expressly require this Court to impose a term of incarceration. Rather, pursuant 18 U.S.C. § 3553, this Court is required to formulate a sentence that is sufficient to accomplish the purposes of sentencing (as addressed below). Accordingly, so long as this Court determines Officer Riley's sentence is sufficient as to him, it is appropriate for purposes of 18 U.S.C. § 3553(a) and takes its place in the grand scheme of the criminal justice system.

As set forth in the PSR:



> The defendant's ███████████████████ █████████ his lack of any criminal record; his history of public service which includes at least two instances where he saved the life of another person; and his positive pretrial compliance record suggest, both individually and collectively, that Mr. Riley is unlikely engage in future criminal conduct, and that an alternative to incarceration may be warranted.

PSR, ¶ 108. Consistent with United States Probation's analysis, based on an evaluation of the facts of this case and the history and characteristics of Officer Riley, especially his history of public service and ████████████████, a non-incarceration sentence is appropriate in

this case.[5] *See* Probation Recommendation at 1-2 (D.E. 102). As discussed below, Officer Riley respectfully requests that the Court depart downward from the Guidelines and/or grant a downward variance and, pursuant to 18 U.S.C. § 3553(a) and consistent with the recommendation of United States Probation (*id.*), impose a total sentence of one year of probation, which would constitute a sentence that is more than sufficient to comply with the purposes of sentencing under the statute.

### A.  Sentencing Discretion and Section 3553(a) Statutory Factors.

In accordance with 18 U.S.C. § 3553(a), this Court is required to impose a sentence that is sufficient, but not greater than necessary to comply with the purposes of the statute, which includes the need for the sentence: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training.

The Guidelines are only advisory despite their mandatory language. *See United States v. Booker*, 543 U.S. 220, 245 (2005). A district court must therefore "consider Guidelines ranges," but is permitted "to tailor the sentence in light of other statutory concerns as well." *Id.* The Supreme Court in *Gall v. United States* outlined the process to follow:

---

[5] Officer Riley has received and reviewed the PSR prepared in this case and has identified his corrections and objections to the same, including his objection to the Government's request for two separate guidelines enhancements, which United States Probation has found are inapplicable. Undersigned counsel will be prepared to address these points further at the sentencing hearing if the Court requires additional arguments beyond those raised in the two separate letters filed under seal in response to the PSR, as well as, in Officer's Riley's written supplement to his motion for judgment of acquittal on Count One and motion for a new trial, both of which outline additional reasons why the Government's requested enhancements are inapplicable.

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving ***both parties an opportunity to argue for whatever sentence they deem appropriate***, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he ***may not presume that the Guidelines range is reasonable***. He must make an individualized assessment based on the facts presented.

552 U.S. 38, 49-50 (2007) (emphasis added) (citations and punctuation omitted).

Thus, in fashioning an appropriate sentence, this Court must consider the Guidelines along with the other factors set forth in 18 U.S.C. § 3553(a) (*see Booker*, 543 U.S. at 260; U.S. Sentencing Commission, Guidelines Manual (Aug. 2021) (hereinafter, "USSG" or the "Guidelines")) and treat the Guidelines "as one factor among several" that § 3553(a) requires courts to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

Under 18 U.S.C § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." Although the Guidelines range will generally align with the objectives of the § 3553(a) factors, that is not always the case. As the Supreme Court said in *Kimbrough*:

> [I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. The sentencing judge, on the other hand, has greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court. He is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case. In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply.

552 U.S. at 109 (citations and punctuation omitted). As one district court has framed it, the

Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula." *See* Terry Carter, *Rakoff's Stance on the SEC Draws Fire, Praise—and Change: The Judge Who Said No*, ABA Journal, Oct. 2013, at 53.

**B.      Applicable Sentencing Guidelines Range.**

The applicable Guidelines section is § 2J1.2, which has a base offense level of 14, and given Officer Riley's absence of any criminal history, the Guidelines provide an advisory range of 15 to 21 months. *See* PSR, ¶ 88 (D.E. 101); Probation Recommendation at 2 (D.E. 102).

**C.      Whether Fashioned as a Departure or a Variance, a Below-Guidelines Sentence is Appropriate in this Case.**

District courts may impose a sentence below the Guidelines range through either a "departure" or "variance." *See United States v. McKinnie*, 21 F.4th 283, 289 (4th Cir. 2021). A "departure" is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently "triggered by a prosecution request to reward cooperation . . . or by other factors that take the case 'outside the heartland' contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense." *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (citation and punctuation omitted). "A 'variance,' by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range based on application of the other statutory factors in 18 U.S.C. § 3553(a)." *Id.* (citation omitted); *see also* USSG § 1B1.1(c). Here, whether characterized as a departure or a variance, Officer Riley should receive a sentence significantly below the applicable Guidelines range.

In the Presentence Report, United States Probation identifies Officer Riley's "███

████████████████████████████████████████████████████████████ as a

potential basis for a downward departure under USSG § 5H1.4. *Accord United States v.*

*McFarlin*, 535 F.3d 808, 810-12 (8th Cir. 2008) (finding variance to a sentence of probation

was warranted in part based on the defendant's "poor health" and "need for medical care").

Officer Riley's lifetime of service, which includes saving multiple lives, also warrants a

departure in this case. *See*, *e.g.*, *United States v. Canova*, 412 F.3d 331, 359 (2d Cir. 2005)

(affirming a downward departure for an ex-Marine who, as a volunteer firefighter, had rescued

a three-year-old from a burning building, delivered three babies, and administered CPR to

persons in distress); *United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (allowing a

downward departure for community service that was "handson" and likely had a dramatic and

positive impact on the lives of others).

Separate and apart from any analysis of a departure, the applicable § 3553(a) sentencing

factors support a non-incarceration sentence in this case. Pursuant to 18 U.S.C. § 3553(a),

sentencing courts should consider several factors, including:

> (1) the nature and circumstances of the offense and the history and characteristics of
> the defendant;
>
> (2) the need for the sentence imposed —
>
>> (A) to reflect the seriousness of the offense, to promote respect for the
>> law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational
>> training, medical care, or other correctional treatment in the most
>> effective manner;

(3) the kinds of sentences available;

                \*       \*       \*

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

> **1.    Defendant's History and Characteristics and the Nature and Circumstances of the Offense.**

Here, it is undisputed that Officer Riley has lived an exemplary life prior to the events of this case, immediately thereafter, and while on release in this case, and has provided service to the public and his community his entire life. He has literally saved lives and made positive contributions in the lives of numerous individuals, as set forth in the numerous letters of support.

> **2.    The Need for the Sentence Imposed.**

Here, deterrence has been established by the Government's mere prosecution and conviction of Officer Riley. His employment ended, he was arrested, he has been prohibited from communicating with certain friends and colleagues, his fellow officers are afraid to even speak to him, he lost the ability to possess a firearm, and he has been on pretrial release, without a single violation, for eighteen months. In national media coverage of this case, Officer Riley was labeled as a dishonest officer who broke his oath and colluded with a January 6 rioter. The deterrence is real and overwhelming. A sentence of incarceration is completely unnecessary, totally in conflict with the statutory factors, and completely inconsistent with the Government's request for probation for participants in the breach of the U.S. Capitol and generally for more serious offenses.

### 3.      <u>The Need to Avoid Unwarranted Sentence Disparities.</u>

Throughout the trial in this matter, the Government focused on the connection between Officer Riley and Jacob Hiles, whom the Government referred to as "Rioter Hiles." Despite having asked for a period of probation for Mr. Hiles and having sought hundreds of sentences of home confinement and minimal incarceration for other alleged "rioters," the Government is seeking a multi-year period of incarceration for Officer Riley. Officer Riley did not storm the U.S. Capitol, he protected it from explosives, yet the Government wants to send him to jail because he deleted his own Facebook direct messages with Mr. Hiles, one of which contained a suggestion to take down a part of a public Facebook post, viewed by hundreds and forwarded and commented on by dozens (a message for which the jury did not convict Officer Riley). The Government's sentencing allocution is completely inapposite to those who did commit crimes on January 6, 2021, and offers no appreciation of the statutory factors, or Officer Riley's years of service and serious medical condition. Below are the names of every January 6, 2021 Capitol breach defendant for whose conduct the Government did not even seek a sentence of incarceration:[6]

| | | |
|---|---|---|
| Morgan-Lloyd, Anna | Vinson, Thomas | Miller, Brandon |
| Ehrke, Valerie | Dillon, Brittiany | Miller, Stephanie |
| Bissey, Donna | Sanders, Jonathan | Hatley, Andrew |
| ***Hiles, Jacob*** | Fitchett, Cindy | Pert, Rachael |
| Wangler, Douglas | Sweet, Douglas | Winn, Dana |
| Harrison, Bruce | Cordon, Sean | Wickersham, Gary |
| Bustle, Jessica | Wilkerson, John | Schwemmer, Esther |
| Doyle, Danielle | Jones, Caleb | Kelly, Kenneth |
| Bennett, Andrew | Brown, Terry | Straka, Brandon |
| Mazzocco, Matthew | Wrigley, Andrew | Sizer, Julia |
| Rosa, Eliel | Parks, Jennifer | Blauser, William |
| Gallagher, Thomas | Reimler, Nicholas | Barnard, Richard |

---

[6] *See* Government's Sentencing Table of January 6 Capitol Breach Defendants, dated March 10, 2023.

| | | |
|---|---|---|
| Witcher, Jeffrey | Reda, Kenneth | Genco, Raechel |
| McAlanis, Edward | McCreary, Brian | Macrae, Douglas Farquhar |
| Lollis, James | Colbath, Paul | Seymour, Paul |
| Schubert, Amy | Lewis, Jacob | Ferguson, Jamie |
| Schubert, John | Lentz, Nicholes | Fontanez-Rodriguez, Samuel |
| Orangias, Michael | Daughtry, Michael | |
| Quick, Michael | Juran, John | |

The above list does not even include all the January 6 Capitol breach defendants for whom the Government sought a sentence of incarceration at sentencing, but judges in this District, nonetheless, refused to impose a period of incarceration:

| | | |
|---|---|---|
| Vinson, Lori | Nalley, Verden | Torre, Benjamin |
| Griffith, Jack | Carico, Michael | Suarez, Marissa |
| Torrens, Eric | Loftus, Kevin | Todisco, Patricia |
| Gruppo, Leonard | Kelley, Kari | Persick, Kerry |
| Ryan, Jennifer | Martin, Zachary | Buckler, Matthew |
| Stotts, Jordan | Cudd, Jenny | Cavanaugh, Andrew |
| Cordon, Kevin | Jackson, Micajah | Ortiz, Christopher |
| Abual-Ragheb, Rasha | Ivey, Bryan | Homer, Lisa |
| Nelson, Brandon | Burress, Gabriel | Fracker, Jacob |
| Markofski, Abram | Pettit, Madison | Thurlow, Steven |
| Marquez, Felipe | Fee, Thomas | McNicoll, Lois Lynn |
| Mariotto, Anthony | Zlab, Joseph | Youngers, Darrell |
| Edwards, Gary | Fox, Samuel | Vollan, Cody |
| Tutrow, Israel | Hardin, Michael | Carollo, Anthoy |
| Kostolsky, Jackson | O'Malley, Timothy | Bratjan, Frank |
| Rusyn, Michael | Rebegila, Mark | Ferreira, Leticia |
| Sells, Tanner | Conover, Thomas | Connor, Francis |
| Walden, Jon | Krzywicki, Carla | Ferrigno, Antonio |
| Prado, Nicole | Kulas, Christian | Lunyk, Anton |
| Williams, Vic | Kulas, Mark | Vincent, Reva |
| Wiedrich, Jacob | Von Bernewitz, Eric | Ayres, Stephen |
| Stepakoff, Michael | Ballesteros, Robert | Hentschel, Cara |
| Wilson, Zachary | Peart, Willard | Munn, Dawn |
| Wilson, Kelsey | Spain, Jr., Edward | Munn, Joshua |
| McAuliffe, Justin | Chapman, Robert | Munn, Kayli |
| Williams, Andrew | Tagaris, Jody | Munn, Kristi |
| Leffingwell, Mark | Sywak, William Jason | Munn, Thomas |
| Sunstrum, Traci | Sywak, William Michael | Munger, Jeffrey |
| Gonzalez, Eduardo | Laurens, Jonathan | Rodean, Nicholas |
| Strong, Kevin | Cunningham, Christopher | Mels, James Allen |

| | | |
|---|---|---|
| Clark, Christy | Frankowski, Dawn | Javid, Iraj |
| Clark, Matthew | Buxton, Jonas | Lanham, Melanie |
| Spigelmyer, Paul | Billingsley, Steven | Gleffe, Marcos |
| Uptmore, James | Gross, Juliano | Heathcote, Chad |
| Brooks, James | Council, Matthew | Manwaring, Susan |
| Yazdani-Isfehani, Abigail | Johnson Jr, Thaddis | Bustos, Alexis |
| Yazdani-Isfehani, Loruhamah | Bond, Stacy Lee | Bustos, Bryan |
| Comeau, Jason | Conlon, Paula | Myers, Rachel |
| Evans III, Treniss | Witzemann, Shawn | Grover, Logan |
| Castle, Trudy | Slaeker, Tyler | Cramer, Country |
| DiFrancesco, Kimberly | Montalvo, Matthew | Gordon, Vaughn |
| Wood, Matthew | Gable, Levi | Gerwatowski, Eric |
| Wiersma, David | Faulkner, Luke | |

If none of the individuals in the above-referenced lists were sentenced to a day in prison for their actions on January 6, 2021, why should Officer Riley, whose history before and after the conduct at issue in this case, *i.e.*, the deletion of his personal Facebook direct messages, was exemplary. If the Government was truly concerned about avoiding sentencing disparities, they would have sought a probationary sentence in this case. Separate and apart from Officer Riley's history of service and serious medical issues, which can be a basis for both a departure or variance, there are numerous examples of federal courts imposing probationary sentences for non-violent, non-dangerous offenses, like this case:

- **Kevin Clinesmith**, who, as an FBI attorney, was prosecuted for providing a doctored email to an FBI agent preparing a FISA surveillance application, was sentenced by Chief Judge Boasberg to twelve months of probation in response to the Government's request for incarceration (No. 20-cr-165 (JEB) (D.D.C. Jan. 29, 2021));

- **Leonardo Silva**, who, as a DEA Special Agent in Monterrey, Mexico, was prosecuted for providing false information that caused two Mexican citizens to have their visas revoked in exchange for post-retirement employment, and who submitted false financial disclosure reports, was sentenced to 2 years of probation (No. 16-cr-69-TFH (D.D.C. 2017));

- **Gloria Dickinson**, who, as a FERC employee and elected Treasurer of Local 421 of the American Federation of Government Employees, was prosecuted for embezzling $21,713 of federal-employee union funds and filing false reports with the Department

of Labor to cover it up, was sentenced by Former Chief Judge Howell to five years of probation (No. 12-cr-00197-BAH (D.D.C. 2012));

- **Martin Lieb**, who, as a DOD employee, was prosecuted for failing to disclose on his financial disclosure form gifts — including a ticket to the Super Bowl, lodging on a cruise ship, and meals and drinks — from a company that had secured DOD contracts worth hundreds of millions of dollars, was sentenced to 2 years of probation (No. 1:10-cr-00144-RBW (D.D.C. 2010));

- **Courtney Stadd**, who, as a former NASA Chief of Staff, was prosecuted for steering millions of dollars of earmarked funds for a NASA initiative to benefit a university with which she had a consulting agreement, thereafter increasing her own consulting fees as a result, was sentenced to 3 years of probation (No. 09-cr-65-RMC (D.D.C. 2009));

- **Turab Lookman**, who was prosecuted as a former scientist from Los Alamos National Laboratory for making false statements regarding his involvement with a Chinese government technology program — stating he had not been recruited by the Chinese program when he in fact had —was sentenced to 5 years of probation (No. 1:19-cr-01439-WJ (D.N.M. 2020));

- **Andrew Siemaszko**, who was prosecuted as an employee of a nuclear power station and who made false statements to the Nuclear Regulatory Commission regarding the condition and maintenance of equipment at the power plant, was sentenced to 3 years of probation (No. 3:06-cr-00712-DAK-3 (N.D. Ohio 2009));

- **Randall Barker**, who was prosecuted for failing to report the full amount of income from his business from 2011 to 2014, admitting to taking direct payments from customers, removing cash from business deposits, and altering invoices to show less income for the business, was sentenced to one year of probation (No. 18-cr-10152 (EFM) (D. Kan. Jul. 31, 2019)) (https://www.justice.gov/usao-ks/pr/flooring-store-owner-sentenced-tax-evasion);

- **Lawrence P. Stephenson**, who was prosecuted for tax evasion, began diverting portions of his practice's business receipts by depositing checks from insurance carriers and patients into a personal bank account, failed to report approximately $1.2 million dollars paid to his dental practice and deposited it elsewhere, thus failing to pay taxes due the IRS, was sentenced to three years' probation and 280 hours per year of community service (No. 18-cr-73 (D.R.I. Nov. 14, 2018)) (https://www.justice.gov/usao-ri/pr/north-providence-dentist-sentenced-tax-evasion-0);

- **Ty Warner**, who was prosecuted for failing to report more than $24.4 million in income, and evading nearly $5.6 million in federal taxes, from millions of dollars he

hid for more than a decade in secret foreign financial accounts at two banks based in Switzerland, was sentenced to 2 years' probation (No. 13-cr-731 (CPK) (N.D. Ill. Jan. 14, 2014)) (https://www.justice.gov/usao-ndil/pr/h-ty-warner-sentenced-probation-after-paying-80-million-taxes-and-penalties-tax-evasion);

- **Jacques Wajsfelner**, who worked in real estate and advertising, held a Swiss bank account valued at over $5 million, and owed more than $400,000 in back taxes, interest, and penalties, was sentenced to three months of home detention (No. 12-cr-641 (NRB) (S.D.N.Y. Mar. 8, 2013));

- **Josephine Bhasin**, who had an account at HSBC in India that held a high balance of $8.3 million, and filed a false Report of Foreign Bank and Financial Accounts ("FBAR") after being contacted by the DOJ, was sentenced to 2 years' probation, the first 3 months to be served in home confinement, and 150 hours of community service (No. 11-cr-268 (ADS) (E.D.N.Y. Mar. 8, 2013));

- **Arvind Ahuja**, who was convicted in a jury trial of willfully filing a false return and willfully failing to file an FBAR due to a failure to disclose more than $8.5 million held in bank accounts at HSBC India,   was sentenced to 3 years' probation, 3 months of home detention, a $350,000 fine, and 450 hours of community service, after the court varied from the Guidelines' range of 41-51 months (No. 11-cr-135 (CNC) (E.D. Wisc. Feb. 6, 2013));

- **Lothar Hoess**, the owner of a company that sold office supplies and equipment, who had a tax loss of between $400,000 and $1,000,000, and faced a Guidelines' range of 30 to 37 months, was sentenced to three years' probation (No. 11-cr-154 (SM) (D.N.H. Mar. 30, 2012));

- **Arthur Joel Eisenberg**, who was prosecuted for filing a false income tax return and failing to report that he had an interest in or signature authority over financial accounts at UBS AG, where at the end of 2004, the total balance of Eisenberg's various UBS financial accounts exceeded $3.1 million, was sentenced to three years' probation (No. 10-cr-00369-JCC (W.D. Wash. Mar. 4, 2011));

- **Harry Abrahamsen**, who was prosecuted for failing to file a FBAR and concealing more than $1 million in Swiss bank accounts, was sentenced to three years of probation, including 12 months of home confinement with electronic monitoring (No. 10-cr-254 (D.N.J. May 24, 2011)) (https://www.justice.gov/opa/pr/new-jersey-ubs-client-sentenced-failing-report-more-1-million-swiss-bank-account);

- **Michael Reiss**, who moved his offshore account to various institutions and countries, failed to participate in the IRS's offshore voluntary disclosure program, and filed false FBARs, and faced a Guidelines' range of 30 to 37 months, was sentenced to 3 years' probation, the first 8 months to be served in a community confinement center, and 30

hours of community service a week for 3 years (No. 11-cr-668 (RMB) (S.D.N.Y. Jan. 1, 2011));

- **Ernest Vogliano**, who opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations, and actively used funds and transferred some after learning of the criminal investigation, was sentenced to 2 years' probation (No. 10-cr-327 (TPG) (S.D.N.Y. Apr. 26, 2011));

- **Jules Robbins**, who created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts that held nearly $42 million was sentenced to 12 months' probation because the court took into consideration his "otherwise unblemished life" (No. 10-cr-333 (RJH) (S.D.N.Y. Oct. 8, 2010));

- **Paul Zabczuk**, who instructed clients to make payments to him through undisclosed accounts in Switzerland and the Bahamas was sentenced to 3 years' probation, 12 months' home detention, and community service (No. 10-cr-60112 (WPD) (S.D. Fla. July 26, 2010));

- **John McCarthy**, who transferred over $1,000,000 to an unreported Swiss bank account and communicated with bank representatives to orchestrate various transactions, was sentenced to 3 years' probation with 6 months of home detention and 300 hours of community service (No. 09-cr-784 (VBF) (C.D. Cal. Mar. 22, 2010));

- **Juergen Homman**, who failed to disclose a Swiss account holding approximately $5 million, was sentenced to 5 years' probation and community service (No. 09-cr-724 (SRC) (D.N.J. Jan. 6, 2010));

- **Steven Rubinstein**, who hid approximately $7 million in unreported Swiss accounts that he used to invest in real estate, was sentenced to 3 years' probation with 12 months of home detention (No. 09-cr-60166 (MGC) (S.D. Fl. Oct. 28, 2009)); and

- **Igor Olenicoff**, a businessman and investor, who held more than $200 million in undisclosed offshore bank accounts and owed $52 million in back taxes, interest, and penalties, was sentenced to two years' probation (No. 07-cr-227 (CJC) (C.D. Cal. Apr. 16, 2008)).

## II.   SENTENCING REQUEST AND RECOMMENDATION.

A term of supervision is determined by reviewing many of the same § 3553(a) factors already considered above, including, relevant here: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for deterrence, to

protect the public, and provide treatment to the defendant; (iii) the available sentences and sentencing range; (iv) relevant policy statements by the Sentencing Commission; and (v) the need to avoid sentencing disparities. *See* 18 U.S.C. § 3583(c). Accounting for these factors, as addressed above, Officer Riley recommends a one-year period of probation including the "standard" conditions recommended by the Guidelines (*see* USSG § 5D1.3(c)). These conditions will significantly restrict Officer Riley's liberty and provide a daily reminder of his criminal conduct by requiring that he, among other things:

- regularly report to his probation officer;
- seek permission from the Court or his probation officer to leave Maryland;
- respond truthfully to questioning by his probation officer;
- live in an approved residence and notify his probation officer or any address change;
- allow his probation officer access to his residence;
- notify his probation officer of any job change;
- refrain from knowingly communicating with criminals;
- notify his probation officer if he is arrested;
- refrain from possessing a firearm or other dangerous weapons; and
- refrain from possessing illegal drugs or alcohol.

*See* PSR, ¶ 98. A one-year period of probation, subject to these conditions, will provide adequate punishment and deterrence while allowing Officer Riley to remain a productive member of society.

## <u>CONCLUSION</u>

For the foregoing reasons and others that may appear to the Court or may develop at the sentencing hearing, Officer Riley respectfully requests that this Court impose a sentence of one year of probation.

Dated: April 6, 2023                         Respectfully submitted,

                                         **SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC**

                                            /s/ Christopher Macchiaroli
                                         Christopher Macchiaroli (D.C. Bar No. 491825)
                                         1750 K Street, NW, Suite 810
                                         Washington, D.C. 20006
                                         Telephone: (202) 539-2444
                                         Facsimile:  (410) 547-2432
                                         Email: cmacchiaroli@silvermanthompson.com

                                         Emma J. Mulford (Bar No. MD0146)
                                         400 East Pratt Street, Suite 900
                                         Baltimore, MD 21202
                                         Telephone: (410) 385-6249
                                         Facsimile: (410) 547-2432
                                         Email: emulford@silvermanthompson.com

                                         *Counsel for Defendant Michael Riley*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of April 2023, a copy of the foregoing Defendant's Sentencing Memorandum was emailed to Christopher Howland, Esq., counsel for the United States of America.

<u> /s/ Christopher Macchiaroli          </u>
Christopher Macchiaroli